No. 23-50162

---

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

UMG RECORDINGS, INC.; CAPITOL RECORDS, L.L.C.; WARNER BROS. RECORDS INCORPORATED; SONY MUSIC ENTERTAINMENT; ARISTA RECORDS, L.L.C.; ARISTA MUSIC; ATLANTIC RECORDING CORPORATION; CAPITOL CHRISTIAN MUSIC GROUP, INC.; ELEKTRA ENTERTAINMENT GROUP INCORPORATED; FONOVISA, INC.; FUELED BY RAMEN LLC; LAFACE RECORDS, L.L.C.; NONESUCH RECORDS INCORPORATED; RHINO ENTERTAINMENT COMPANY; ROADRUNNER RECORDS, INCORPORATED; ROC-A-FELLA RECORDS, L.L.C.; TOOTH & NAIL, L.L.C.; ZOMBA RECORDING, L.L.C.,

*Plaintiffs-Appellees/Cross-Appellants*,

*v.*

GRANDE COMMUNICATIONS NETWORKS, L.L.C.,

*Defendant-Appellant/Cross-Appellee.*

---

On Appeal from the United States District Court
for the Western District of Texas (Austin)
No. 1:17-cv-000365-DAE

---

# RESPONSE AND PRINCIPAL BRIEF OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

---

**[caption continued on next page]**

Paige Arnette Amstutz
SCOTT, DOUGLASS &
MCCONNICO, LLP
303 Colorado Street
Suite 2400
Austin, TX 78701
(512) 495-6300
pamstutz@scottdoug.com

Andrew H. Bart
Jacob L. Tracer
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600
abart@jenner.com
jtracer@jenner.com

Ian Heath Gershengorn
JENNER & BLOCK LLP
1099 New York Avenue NW,
Suite 900
Washington, DC 20001
(202) 639-6000
igershengorn@jenner.com

*Counsel for Plaintiffs-Appellees/Cross-Appellants*

# CERTIFICATE OF INTERESTED PERSONS

No. 23-50162, *UMG Recordings, Inc., et al. v. Grande Commc'ns Networks, LLC*

Undersigned counsel of record for Plaintiffs-Appellees/Cross-Appellants certifies that the Certificate of Interested Persons in the previously filed briefs are complete except that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1) Plaintiffs-Appellees/Cross-Appellants: additional trial counsel: Kevin Attridge, Robert B. Gilmore, Philip O'Beirne (Stein Mitchell Beato & Missner LLP)

2) Plaintiffs-Appellees/Cross-Appellants: additional appellate counsel: Ian Heath Gershengorn (Jenner & Block LLP)

Dated: December 1, 2023

/s/ Andrew H. Bart
   Andrew H. Bart
*Attorney of Record for Plaintiff-Appellees/Cross-Appellants*

i

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees/Cross-Appellants ("Plaintiffs") agree with Defendant-Appellant/Cross-Appellee ("Grande") that oral argument would assist the Court in resolving the issues arising from this appeal. However, Plaintiffs disagree with how Grande articulated the issues to be resolved.

In this appeal, Grande seeks to upend decades of well-established copyright law and effectively make it impossible for Plaintiffs and other copyright owners to protect against the mass infringement of music, movies, books, and other works by users of online peer-to-peer file-sharing systems. No existing case law supports that result. Plaintiffs submit that oral argument will assist the Court in understanding both the legal errors in Grande's arguments and the profoundly inequitable result that will ensue if Grande is granted the relief it seeks in connection with this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................. i

STATEMENT REGARDING ORAL ARGUMENT .................................... ii

TABLE OF AUTHORITIES ................................................................... vi

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................... 3

STATEMENT OF THE CASE .............................................................. 5

    A.    Factual Background ................................................................. 5

        1.    The Parties ................................................................. 5

        2.    BitTorrent Piracy ....................................................... 6

        3.    The Role Of ISPs ........................................................ 8

        4.    Grande's Culpable Conduct ....................................... 11

    B.    Procedural History ................................................................. 16

    C.    Rulings Presented For Review In Plaintiffs' Conditional
        Cross-Appeal ......................................................................... 18

SUMMARY OF THE ARGUMENT ....................................................... 19

STANDARD OF REVIEW ................................................................... 23

ARGUMENT ..................................................................................... 25

I.    There Is No Basis To Disturb The Jury's Verdict Finding Grande
    Liable For Contributory Copyright Infringement. ......................... 25

    A.    The District Court Correctly Concluded As A Matter Of Law
        That Plaintiffs Own Or Exercise Exclusive Control Over The
        Copyrights At Issue, And Grande Does Not Argue
        Otherwise. ............................................................................. 26

B.    The Jury Was Presented With Overwhelming Evidence Of Direct Infringement At Trial. ................................................. 28

C.    The District Court Applied The Correct Legal Standard For Contributory Infringement, And Plaintiffs Presented Sufficient Evidence Of Such Infringement At Trial. ............ 34

    1.    Materially Contributing To Direct Infringement Has Always Been A Valid Basis For Contributory Infringement. ................................................................. 38

        a.    *Sony* And *Grokster* Did Not Write Material Contribution Out Of The Law. ............................ 40

        b.    *Twitter* Does Not Address The Issue At Hand Or Absolve Grande Of Liability ................................. 47

    2.    The District Court Properly Interpreted And Instructed The Jury On Plaintiffs' Material Contribution Claim. 52

        a.    It Is Undisputed That Grande Provided Infringing Subscribers With The Tools Necessary To Continue Infringing. ........................................ 54

        b.    The Court's Instruction Requiring The Jury To Find That Simple Measures Were Available To Grande To Prevent Further Damage To Copyrighted Works Favored Grande And Is Not A Basis For Grande To Seek Reversal. .................. 57

        c.    The District Court's Jury Instruction Was Proper ................................................................ 64

    3.    Plaintiffs' Trial Evidence Was Sufficient To Prove Material Contribution. .................................................. 65

II.    There Is No Basis To Disturb The District Court's Ruling That Each Of Plaintiffs' 1,403 Sound Recordings Was Entitled To A Separate Statutory Damages Award. .............................................. 67

III.  If The Court Remands This Case To The District Court For A New Trial, It Should Also Correct The District Court's Erroneous Jury Instruction Regarding Whether A Plaintiff Must Demonstrate An Actual Distribution To Prove Infringement Of Its Exclusive Righ To Distribute Its Copyrighted Works. ............................................ 72

CONCLUSION ........................................................................... 75

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001)....................................................58, 73, 74

*Abraham v. Alpha Chi Omega*,
708 F.3d 614 (5th Cir. 2013).........................................................5, 24

*In re Aimster Copyright Litig.*,
334 F.3d 643 (7th Cir. 2003).............................................................62

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
166 F.3d 772 (5th Cir. 1999)....................................3, 19, 25, 34, 38, 39

*BMG Rights Mgmt. (US) LLC v. Altice USA, Inc.*,
No. 22-CV-00471, 2023 WL 3436089 (E.D. Tex. May 12,
2023) .........................................................................................9, 45

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
881 F.3d 293 (4th Cir. 2018)..............................9, 36, 45, 46, 54, 55, 63

*Bridgmon v. Array Sys. Corp.*,
325 F.3d 572 (5th Cir. 2003).............................................................33

*Cobbler Nevada, LLC v. Gonzales*,
901 F.3d 1142 (9th Cir. 2018).........................................................57

*Cullum v. Diamond A Hunting, Inc.*,
484 F. App'x 1000 (5th Cir. 2012) .....................................................69

*David v. CBS Interactive Inc.*,
No. 11-cv-9437, 2012 WL 12884914 (C.D. Cal. July 13,
2012) .........................................................................................46

*Davis v. Scott*,
157 F.3d 1003 (5th Cir. 1998).............................................................23

*Diversey v. Schmidly,*
   738 F.3d 1196 (10th Cir. 2013) ........................................... 73

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC,*
   844 F.3d 79 (2d Cir. 2016) ........................................... 69, 70

*Gamma Audio & Video, Inc. v. Ean-Chea,*
   11 F.3d 1106 (1st Cir. 1993) .................................. 68, 69, 71

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,*
   443 F.2d 1159 (2d Cir. 1971) ....................................... 19, 39

*Global-Tech Appliances, Inc. v. SEB S.A.,*
   563 U.S. 754 (2011) ............................................................ 62

*Hotaling v. Church of Jesus Christ of Latter-Day Saints,*
   118 F.3d 199 (4th Cir. 1997) ............................................. 73

*King v. Ames,*
   179 F.3d 370 (5th Cir. 1999) ............................................. 33

*King ex rel. King v. Ames,*
   No. 95-CV-3180, 1997 WL 327019 (N.D. Tex. June 4,
   1997) ................................................................................... 33

*Koon v. United States,*
   518 U.S. 81 (1996) ............................................................. 23

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.,*
   658 F.3d 936 (9th Cir. 2011) ....................................... 54, 64

*Maverick Recording Co. v. Harper,*
   No. 07-CV-026, 2008 WL 11411855 (W.D. Tex. Sept. 16,
   2019), *aff'd in part and rev'd in part,* 598 F.3d 193 (5th
   Cir. 2010) ........................................................................... 74

*MCA Television Ltd. v. Feltner,*
   89 F.3d 766 (11th Cir. 1996) ............................................. 69

*Merritt Hawkins & Assocs., L.L.C. v. Gresham,*
   861 F.3d 143 (5th Cir. 2017) ............................................. 66

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ................................................. 39, 42, 43, 46, 47, 55

*Motown Record Co., LP v. DePietro*,
  No. 04-CV-2246, 2007 WL 576284 (E.D. Pa. 2007) ........................... 74

*Olibas v. Barclay*,
  838 F.3d 442 (5th Cir. 2016) ................................................................ 23

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) .................................... 57, 58, 59, 62, 63

*Perfect 10, Inc. v. Giganews, Inc.*,
  847 F.3d 657 (9th Cir. 2017) ............................................................... 58

*Perfect 10, Inc. v. Visa International Service, Ass'n*,
  494 F.3d 788 (9th Cir. 2007) ............................................................... 51

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ............................................................................ 24

*Sony Corp. of America v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ........................................ 39, 40, 41, 42, 43, 44, 45

*Sullivan v. Flora, Inc.*,
  936 F.3d 562 (7th Cir. 2019) .................................................. 68, 69, 70

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023) .......................................................... 39, 48, 49, 50

*UMG Recordings, Inc. v. Bright House Networks, LLC*,
  No. 19-cv-710, 2022 WL 4552434 (M.D. Fla. July 1, 2022) .................. 9

*UMG Recording, Inc. v. Escape Media Grp., Inc.*,
  No. 11 Civ. 8407, 2014 WL 5089743 (S.D.N.Y. Sept. 29,
  2014) .................................................................................................. 30

*UMG Recordings, Inc. v. RCN Telecom Servs., LLC*,
  No. 19-cv-17272, 2020 WL 5204067 (D.N.J. Aug. 31, 2020) ..... 9-10, 45

*Universal City Studios Prods., LLLP v. Bigwood*,
  441 F. Supp. 2d 185 (D. Me. 2006) ..................................................... 74

*VHT, Inc. v. Zillow Grp., Inc.,*
  918 F.3d 723 (9th Cir. 2019)...................................................58, 59, 69

*Walt Disney Co. v. Powell,*
  897 F.2d 565 (D.C. Cir. 1990) ...........................................................69

*Warner Bros. Records, Inc. v. Payne,*
  No. 06-CA-051, 2006 WL 2844415 (W.D. Tex. July 17,
  2006) ......................................................................................................74

**Statutes**

17 U.S.C. § 106(3) ...................................................................................72

17 U.S.C. § 410(c)...................................................................................71

17 U.S.C. § 504(c)(1) ............................................................4, 22, 67, 68

17 U.S.C. § 512.........................................................................................10

17 U.S.C. § 512(i)(1)(A)....................................................................11, 60

28 U.S.C. § 1138(a) ...................................................................................1

28 U.S.C. § 1291........................................................................................1

28 U.S.C. § 1331........................................................................................1

**Other Authorities**

*Restatement (Second) of Torts* § 8A (1965) .............................................55

## JURISDICTIONAL STATEMENT

Plaintiffs do not dispute Grande's jurisdictional statement.  *See* Br. at 1.

This Court also has jurisdiction over Plaintiffs' conditional cross-appeal.  Subject matter jurisdiction was appropriate in the district court pursuant to 28 U.S.C. §§ 1331 and 1138(a).  Plaintiffs' conditional cross-appeal follows a final judgment disposing of all parties' claims, and this Court has jurisdiction over appeals from final judgments pursuant to 28 U.S.C. § 1291.

Further, Plaintiffs' conditional cross-appeal is timely because the district court entered final judgment on January 30, 2023, ROA.10033-34, Grande filed a renewed motion for judgment as a matter of law or, in the alternative, a new trial on February 27, 2023, ROA.10552-68, Grande filed a notice of appeal on March 1, 2023, ROA.10569-70, and Plaintiffs filed their notice of conditional cross-appeal on March 13, 2023, ROA.10585-86.

On May 11, 2023, the district court denied Grande's post-trial motion.  ROA.11015-55.  Grande filed an amended notice of appeal on June 9, 2023.  ROA.11056-58.  Because none of the issues presented by

Plaintiffs' conditional cross-appeal were addressed in Grande's post-trial motion, Plaintiffs were not required to amend their notice of conditional cross-appeal.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Plaintiffs obtained a judgment holding Grande liable for
contributory copyright infringement.  That claim has four elements:
(1) that Plaintiffs own or have exclusive control over valid copyrights;
(2) that those copyrights were directly infringed by Grande's
subscribers; (3) that Grande had knowledge of its subscribers' infringing
activity; and (4) that Grande induced, caused, or materially contributed
to its subscribers' infringements.  *See Alcatel USA, Inc. v. DGI Techs.,
Inc.*, 166 F.3d 772, 790 (5th Cir. 1999) (quoting *Gershwin Publ'g Corp.
v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)).
Grande does not dispute the first and third elements.  Accordingly, the
issues on appeal are:

a.    Whether Plaintiffs presented sufficient evidence at trial to
support the jury's finding that Grande's subscribers directly
infringed Plaintiffs' copyrights; and

b.    Whether the district court was correct that providing
material contribution to infringing activity is a valid
foundation for a finding of contributory infringement,
whether the district court properly instructed the jury on

3

that issue, and whether Plaintiffs presented sufficient evidence at trial to support the jury's finding that Grande materially contributed to its subscribers' infringing activity.

2.     The Copyright Act permits copyright owners to recover one statutory damages award "for all infringements involved in the action, with respect to any one work."  17 U.S.C. § 504(c)(1).   The issue on appeal is whether the district court was correct to determine that each of Plaintiffs' 1,403 sound recordings at issue—each of which was undeniably marketed, licensed, and sold as an individual work—was a separate "work" under Section 504(c)(1) and thus entitled to an individual statutory damages award.

3.     Only in the event that this Court remands this case for another trial, Plaintiffs' conditional cross-appeal raises the issue of whether the district court erred by failing to instruct the jury that making copyrighted works available online for third parties to copy without authorization is sufficient to infringe the exclusive right of copyright owners to distribute their copyrighted works.

# STATEMENT OF THE CASE

This appeal arises out of a judgment entered in Plaintiffs' favor following a three-week jury trial. After hearing all the evidence, ten jurors unanimously found Grande liable for willful contributory copyright infringement. The jury awarded Plaintiffs $46,766,200.00 in statutory damages pursuant to the Copyright Act. ROA.10005-06. That award was based on Plaintiffs' presentation of the facts below, which this Court must "credit" just as the jury did. *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (citation omitted).

## A.    Factual Background

### 1.    The Parties

Plaintiffs are entities affiliated with the three major record companies in the United States: Universal Music Group ("Universal"), Sony Music Entertainment ("Sony") and Warner Music Group ("Warner"). ROA.11593-94. Collectively, Plaintiffs own copyrights in or have exclusive rights to a large majority of the sound recordings commercially distributed in the United States. ROA.11594-95.

Grande is a provider of internet, cable television, and landline phone services. ROA.12029; ROA.12850-51. A significant component of its business is to function as an internet services provider ("ISP"),

providing high-speed internet access to subscribers in exchange for monthly subscription fees.  ROA.12403; ROA.12590-91; ROA.12593; ROA.12751.

### 2.    BitTorrent Piracy

This case arises out of Grande's conscious decision to maximize its profits by continuing to provide internet services to subscribers it knew were using those services to repeatedly infringe Plaintiffs' sound recording copyrights using a peer-to-peer file-sharing network known as BitTorrent.

Peer-to-peer ("P2P") file-sharing networks have existed for decades and enable internet users to copy and distribute digital files directly with each other.  ROA.12796; ROA.12798.  Notable examples over the years include Napster, Grokster, KaZaA, and LimeWire. ROA.12796; ROA.12798.  P2P networks have caused untold harm to copyright owners by facilitating the unauthorized distribution of perfect copies of copyrighted works.  ROA.12797.  Indeed, each of the P2P networks mentioned above was sued by copyright owners for secondary copyright infringement, adjudicated to be liable, and shut down as a result.  ROA.12798-800.

P2P networks have evolved over time, making them increasingly difficult for copyright owners to police. Relevant here, BitTorrent substantially limits the ability of copyright owners to protect their rights in two important ways. First, BitTorrent is decentralized, meaning that no single company or entity manages the distribution of its software. ROA.12800-01. Thus, there is no "BitTorrent" entity that can be sued like Napster or Grokster were. ROA.12800-02. Second, BitTorrent is "anonymous," meaning that its users cannot be identified by their names or physical addresses. ROA.12803. Rather, BitTorrent identifies users only by their "IP addresses," which are unique strings of characters identifying particular devices connected to networks run by various ISPs. ROA.12803. Only the ISPs operating those networks possess the records necessary to match specific IP addresses to specific internet users. ROA.12803; ROA.12326-27.

In an attempt to address the profound harm that BitTorrent inflicts on the copyright ecosystem, third-party companies have developed technologies to infiltrate BitTorrent and identify infringing users by their IP addresses. ROA.11737-38; ROA.12025-26. One such

company is called Rightscorp, Inc. ("Rightscorp").  In particular,

Rightscorp's proprietary technology:

- Interacts with BitTorrent users and obtains their agreement to distribute unauthorized copies of copyrighted works, ROA.11751-52; ROA.12084-86; ROA.12094-95;

- Records the relevant available details of that agreement, such as the user's IP address and what the infringed content is, ROA.11750; ROA.11764; ROA.12095;

- Cross-references the user's IP address against publicly available databases to identify which ISP is affiliated with that IP address, ROA.11752; ROA.11755; ROA.12109-110;

- Generates and sends infringement notices to the relevant ISPs so that they can identify their infringing subscribers and take appropriate action, ROA.11752; ROA.12110; ROA.12129; and

- Frequently reconnects with the identified infringing IP addresses and downloads copies of the copyrighted works at issue directly from those users, ROA.11752.

In other words, Rightscorp identifies infringing conduct on BitTorrent,

documents that conduct, and uses the information available to it to

notify ISPs of its findings so that the ISP can take appropriate action.

### 3.    The Role Of ISPs

While technologies like Rightscorp's are a critical first step in

addressing piracy on BitTorrent, they are wholly ineffective without the

participation of the relevant ISPs.  As noted above, only the ISPs

possess the records necessary to match specific IP addresses to specific individual subscribers.  *See supra*, at 7.  Thus, when Rightscorp sends its notices to ISPs informing them of the IP addresses of their subscribers engaging in specific infringing conduct, the ISPs are the only parties capable of identifying the infringing subscribers and addressing their misconduct.  ROA.11747-52; ROA.12029-32; ROA.12326-27; ROA.12802-04.

Not only is the involvement of ISPs essential to any attempt to police infringement utilizing BitTorrent, but ISPs are legally obligated to get involved once they have notice of their subscribers' infringing activity.  As explained in more detail below, courts have long held copyright defendants liable when they knowingly provide material contribution to infringing conduct.  *See infra*, at 38-47.  The Fourth Circuit has applied this longstanding copyright principle to an ISP and held that it could be liable for continuing to provide internet services to known infringing subscribers.  *See BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 307-08 (4th Cir. 2018).[1]  Thus, once ISPs

---

[1] Multiple district courts around the country have held the same.  *See BMG Rights Mgmt. (US) LLC v. Altice USA, Inc.*, No. 22-CV-00471, 2023 WL 3436089, at *13 (E.D. Tex. May 12, 2023); *UMG Recordings, Inc. v. Bright House Networks, LLC*, No. 19-cv-710, 2022 WL 4552434, at *3-4 (M.D. Fla. July 1, 2022); *UMG Recordings,*

obtain knowledge that their subscribers are repeatedly using their services to infringe, they are secondarily liable for that conduct if they continue to provide those subscribers with the internet services necessary to continue infringing.

Given how critical the involvement of ISPs is in this process, copyright law further incentivizes ISPs to participate in addressing the conduct of their infringing subscribers by providing an express defense to infringement claims seeking damages if the ISPs take minimal responsive steps upon learning of such infringements. In particular, 17 U.S.C. § 512 ("Section 512"), enacted as part of the Digital Millennium Copyright Act ("DMCA"), gives ISPs a complete defense—known as a "safe harbor"—to claims seeking damages for copyright infringement based on the activities of their users.

However, that safe harbor defense is available to ISPs only if they meet certain threshold requirements, including that they have "adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers . . . who are

_____

*Inc. v. RCN Telecom Servs., LLC*, No. 19-cv-17272, 2020 WL 5204067, at *8-10 (D.N.J. Aug. 31, 2020).

repeat infringers." 17 U.S.C. § 512(i)(1)(A).  In other words, ISPs can avoid infringement claims like those Plaintiffs assert here, but only if they adopt and reasonably implement policies to terminate repeat infringing subscribers.  Section 512 accordingly balances the interests of copyright owners (who need the help of ISPs to stop mass infringements by subscribers of their networks) and ISPs (who are immunized from infringement claims seeking damages if they take minimal steps to address their infringing subscribers).

### 4. Grande's Culpable Conduct

At trial, Plaintiffs demonstrated that Grande understood these legal obligations, but consciously ignored them.  Instead, Grande decided in 2010 to maximize its revenues by continuing to collect subscription fees from subscribers it knew were repeat copyright infringers and providing them with the tools necessary to continue infringing, namely Grande's high-speed internet services.

In the early 2000s, Grande began addressing copyright infringement by its subscribers through an "abuse process," which the company employed to address illicit activity conducted on its network.  ROA.12321-22; ROA.12389-90.  At that time, when Grande received an

infringement notice about one of its subscribers, Grande disconnected

that subscriber's service. ROA.12391-95. Grande then informed the

subscriber and applied "punitive measures" if the conduct continued.

ROA.12332-33, 12395-97. One of Grande's trial witnesses agreed that

subsequent infringements by the same subscriber "led to account

termination." ROA.12332.[2]

However, in 2009, a private equity firm called ABRY Partners

purchased Grande and installed a different company to manage

Grande's operations. ROA.12397. In October 2010, that company

changed Grande's policy. ROA.12398. Under Grande's new policy,

Grande no longer terminated subscribers for copyright infringement, no

matter how many infringement notices Grande received. ROA.12398-

400. As Grande's corporate representative at trial admitted, Grande

"could have received a thousand notices about a customer, and it would

---

[2] At trial, Grande disputed whether account terminations occurred during this time period, and maintains that position in its brief here, claiming that the trial evidence showed that before 2010, it only "occasionally suspended" subscribers' service "on an ad hoc basis," in response to infringement notices. Br. at 11 n.5. That argument is improper on appeal as it ignores the testimony provided by Grande's own employees. In addition to the testimony cited above, Grande's corporate representative at trial testified at his deposition that Grande "*did terminate subscribers for copyright infringement*" during this time period. ROA.12396. While that witness changed his testimony at trial, the jury was entitled to rely on his prior conflicting statement, as well as the trial testimony of his colleague, cited above.

not have terminated that customer for copyright infringement."
ROA.12400.  Further, under Grande's new policy, Grande did not take
any other remedial action to address infringing subscribers, such as
suspending their accounts or requiring them to contact Grande to
maintain their services.  ROA.12398-99.  Grande maintained that policy
of willful blindness for nearly seven years—the very period addressed in
this litigation.  ROA.12399.

During that time period, Grande received millions of copyright
infringement notices from companies monitoring P2P networks like
BitTorrent identifying specific infringements by specific subscribers.  In
particular, in 2011, Rightscorp began sending notices to Grande (and
other ISPs), pursuant to an agreement it had with certain music
publishing companies.  ROA.11738; ROA.341947.[3]  Between 2011 and

---

[3] There are "two distinct copyrights" in any piece of recorded music: the musical
composition (*i.e.*, the written music and lyrics of a song), and the sound recording
(*i.e.*, the particular performance of a song encompassed in the recording).
ROA.11596-97.  For example, while Dolly Parton wrote the song "I Will Always
Love You" and therefore owns the rights in the musical composition, Sony owns the
sound recording copyright to Whitney Houston's particular recording of that song.
ROA.11597.  Music publishing companies generally administer copyrights in
musical compositions, whereas record companies like Plaintiffs generally own and
exploit copyrights in sound recordings.  ROA.11596-97.  Thus, it is undisputed that
a notice from a monitoring company for a specific song puts the ISP on notice of two
separate infringements: one of the copyright in the sound recording and one of the
copyright in the musical composition.

when Plaintiffs filed this lawsuit in 2017, Rightscorp sent more than 1.3 million infringement notices to Grande.  ROA.11832-33; ROA.12765. Each one documented a specific instance of a Grande subscriber agreeing to distribute a copy of a copyrighted work without authorization.  ROA.11752; ROA.12109-11.  Rightscorp also sent periodic "roll-up reports" to Grande, each of which summarized the infringement notices that Rightscorp had previously sent to Grande. ROA.11797-800.  Indeed, the jury learned that in one year alone, Grande had been advised that more than forty of its subscribers had infringed over 1,000 times and that one subscriber had infringed nearly 14,000 times.  ROA.12432.

During the time period when Grande was receiving Rightscorp's notices but had a policy not to terminate the accounts of any subscribers for copyright infringement, one of Grande's own employees questioned the legality of Grande's conduct.  That employee testified at trial that, in April 2013, he "was concerned" that Grande was not in compliance with the law.  ROA.12649.  He even wrote an email to his colleagues explaining that Grande's policy had "no limits" and that some of Grande's subscribers were "up to their 54th notice" with "no process for

remedy in place." ROA.341599. After raising these concerns, the employee did not learn anything that gave him comfort that Grande was complying with the law; instead, he was taken off the project he was working on. ROA.12654. Grande did not change its policy.

Indeed, Grande did not change its policy even after learning in December 2015 that a different ISP, Cox Communications, had been found liable for secondary infringement based on its continued provision of internet services to subscribers it knew were infringing based upon its receipt of Rightscorp's notices. ROA.12407-09; ROA.341626.

Shortly thereafter, Grande undertook an internal investigation to determine how many Rightscorp's notices it had received over the years and had internal discussions about a letter Rightscorp sent to Grande a year earlier seeking a meeting to discuss how they could work collaboratively to address infringements by Grande's subscribers. ROA.12410-16; ROA.341614-20; ROA.349205-10; ROA.341646-47; ROA.341564. Yet even then, Grande chose not to change its policy, or even to meet with Rightscorp. ROA.12411. Instead, it continued providing its infringing subscribers with internet services and collecting subscription fees from those subscribers. Grande did not resume

terminating subscribers for copyright infringement until after Plaintiffs initiated this lawsuit.  ROA.12447-48.

Grande's policy during the nearly seven years at issue in this case not to terminate any subscribers for copyright infringement stood in stark contrast to its policy during the same time period regarding subscribers who did not pay Grande's monthly fees.  Indeed, the trial record established that Grande consistently terminated the accounts of *all* subscribers who stopped paying Grande's fees during that time period.  One of Grande's witnesses admitted that Grande terminated non-paying subscribers 100% of the time and that, during the time period relevant to this case, Grande terminated "thousands" of subscribers for nonpayment.  ROA.12738-39.  Thus, the trial record demonstrated that, while Grande willingly provided its services to subscribers who damaged Plaintiffs by infringing their copyrights, Grande refused to provide its services to subscribers who damaged Grande by failing to pay Grande's monthly fees.

## B.    Procedural History

Plaintiffs filed suit against Grande in 2017, alleging claims for both contributory and vicarious copyright infringement.  ROA.112-18.

The district court dismissed the vicarious infringement claim at the pleading stage.  ROA.984-86.[4]

After discovery, the parties cross-moved for summary judgment. ROA.2409-31; ROA.3033-56; ROA.3625-62.  While Grande had asserted that it was entitled to the DMCA safe harbor defense, the district court held that Grande was not entitled to that defense as a matter of law. ROA.6385-95.  Grande does not dispute that ruling on appeal.  The district court otherwise denied the parties' cross-motions on liability, concluding that fact issues precluded the resolution of Plaintiffs' contributory infringement claim as a matter of law. ROA.6396-430; ROA.6429.

Accordingly, that claim went to trial.  A jury of ten jurors was impaneled in Austin, Texas on October 7, 2022.  ROA.11419-20.  Trial was held from October 12, 2022 through November 1, 2022. ROA.11476-693; ROA.13430-636.  During trial, Grande moved orally for judgment as a matter of law on the issue of its liability, ROA.13483-87, which the district court denied, ROA.13491-92.  After deliberating for a

---

[4] While Plaintiffs contend that dismissal was in error, they are not disputing it for the purposes of this appeal.

day and a half, the jury returned a verdict on November 3, 2022 and found that Grande was liable for contributory copyright infringement of 1,403 of Plaintiffs' sound recordings, that Grande's infringement was willful, and that Plaintiffs were entitled to $33,333.00 per recording infringed, or $46,766,200.00 total, in statutory damages.  ROA.10005-06.

After trial, Grande renewed its motion for judgment as a matter of law.  ROA.10552-68.  The district court denied that motion. ROA.11015-55.  This appeal followed, as well as Plaintiffs' conditional cross-appeal. ROA.11056-58; ROA.10585-86.

## C.    Rulings Presented For Review In Plaintiffs' Conditional Cross-Appeal

Plaintiffs' cross-appeal is conditional on this Court first determining that this case must be remanded to the district court for a new trial.  To be clear, Plaintiffs contend that the district court's judgment should be affirmed.  However, if this Court disagrees and remands the case for a new trial, Plaintiffs' cross-appeal challenges one ruling made by the district court in its jury instructions.  ROA.9907-34.

## SUMMARY OF THE ARGUMENT

For nearly seven years, Grande enabled and facilitated massive copyright infringements by subscribers of its internet services as a result of its conscious decision to provide subscribers it knew were using those services to infringe with the very tools they needed to continue doing so. After a jury appropriately found Grande liable for contributory copyright infringement based on that conduct, Grande now seeks to evade the consequences of its actions.

This Court should not permit Grande to do so. The theory of contributory infringement that Plaintiffs pursued in this case—that a defendant is liable when it has knowledge of specific instances of direct infringement and "induces, causes or materially contributes" to that infringement—has been the established law of this Circuit for more than twenty years and of other courts generally for more than fifty years. *See Alcatel*, 166 F.3d at 790; *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971). The district court was correct to permit Plaintiffs to pursue this theory at trial and to instruct the jury on its elements.

19

Grande provides no valid basis to upend the jury's verdict holding Grande liable. On appeal, Grande challenges two of the four elements of Plaintiffs' claim. First, while Grande claims the jury lacked sufficient evidence to determine that Grande's subscribers directly infringed Plaintiffs' copyrights, the jury was in fact presented with overwhelming evidence of this issue at trial. The trial record is replete with evidence about how Rightscorp reliably detected infringement by Grande's subscribers, sent Grande more than one million notices of infringement, and downloaded copies of infringing files directly from Grande's subscribers.

Moreover, the record also demonstrated that the files identified by Rightscorp's technology were, in fact, Plaintiffs' copyrighted works. Specifically, Plaintiffs' trade association, the Recording Industry Association of America, Inc. ("RIAA"), used an industry-standard software program, relied on by multiple courts, to forensically match the downloaded files to Plaintiffs' sound recordings, and the error rate of that software program is one in three ***billion***. That evidence is more than sufficient to prove direct infringement.

Second, Grande takes the radical position that "material contribution" should be written out of the law of contributory infringement altogether. However, the district court in this case repeatedly and correctly concluded that knowingly providing material contribution to infringement is—and has always been—a valid basis to find contributory infringement. The district court properly recognized that this theory of liability relies on flexible and longstanding principles recognized under common law. While Grande contends that the U.S. Supreme Court has limited the scope of contributory liability, Grande distorts and misinterprets the precedents on which it relies.

The district court also correctly determined the standard of conduct necessary for the jury to find that Grande materially contributed to its subscribers' infringements and then properly instructed the jury as to which factual disputes it had to resolve in order to render a verdict. Applying the appropriate legal standards, the trial evidence was more than sufficient to support the jury's verdict on this issue.

Moreover, there is no basis to disturb the damages award in this case. The district court correctly determined that each of Plaintiffs'

1,403 sound recordings at issue was entitled to a separate award of statutory damages. The Copyright Act provides that Plaintiffs can recover a statutory damages award for each "work" that was infringed. 17 U.S.C. § 504(c)(1). Numerous circuit court decisions from around the country hold that when copyrighted works have their own independent value in the marketplace at the time of their infringement, they are considered separate "works" for the purpose of Section 504. Plaintiffs presented unrebutted testimony at trial demonstrating that their copyrighted sound recordings met this standard, and the district court appropriately relied on that testimony in ruling in Plaintiffs' favor on this issue.

Accordingly, the judgment below should be affirmed. However, because one of the potential remedies Grande seeks in this appeal is a remand for a new trial, *see, e.g.*, Br. at 60, Plaintiffs also raise a cross-appeal that is conditional on that relief being granted. In that circumstance, this Court should also address one error the district court made in its jury instructions. In particular, this Court should hold that making a copyrighted work available for others to download online violates a copyright owner's exclusive right to distribute its work.

## STANDARD OF REVIEW

Grande's appeal challenges the district court's denial of Grande's motion for summary judgment, the district court's denial of Grande's motion for judgment as a matter of law, the legal sufficiency of the district court's jury instructions, and the district court's determination as a matter of law of how many of Plaintiffs' sound recordings were eligible for individual statutory damages awards.  Ultimately, Plaintiffs do not dispute that these issues are reviewed *de novo*.[5]  However, Grande's description of the relevant standard of review ignores how it is applied in the specific context of a judgment following a jury trial.[6]

When a party challenges the denial of a motion for judgment as a matter of law following a jury trial, this Court's standard of review is "especially deferential" to the jury's verdict.  *Olibas v. Barclay*, 838 F.3d 442, 448 (5th Cir. 2016) (citation omitted).  Indeed, this Court must

---

[5] Plaintiffs' conditional cross-appeal is also reviewed *de novo* because Plaintiffs contend that the district court made an error of law in its jury instructions.  *See Koon v. United States*, 518 U.S. 81, 99-100 (1996).

[6] While Grande also criticizes how the district court resolved its motion for judgment as a matter of law, *see* Br. at 16-18, that issue is irrelevant.  As Grande recognizes, the district court determined that Grande preserved its arguments for appeal.  *See* Br. at 18.  This Court will review the issues *de novo* and can affirm the judgment "upon any basis supported by the record."  *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998).  Thus, Grande's criticisms of the district court have no bearing on the outcome of any of the issues it asks this Court to consider.

"credit the non-moving party's evidence and disregard all evidence favorable to the moving party that the jury is not required to believe." *Abraham*, 708 F.3d at 620 (cleaned up).  That is because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (citations omitted).  Accordingly, this Court should reject all of Grande's numerous attempts to characterize the evidence that was presented at trial and should reject any arguments relying on those characterizations as improperly usurping the role of the jury.

Moreover, Grande ignores that its challenge to the district court's jury instructions can prevail only if this Court determines that any "erroneous instruction affected the outcome of the case." *Abraham*, 708 F.3d at 620 (citation omitted).  As explained below, Grande cannot make such a showing.

# ARGUMENT

## I. There Is No Basis To Disturb The Jury's Verdict Finding Grande Liable For Contributory Copyright Infringement.

Pursuant to longstanding principles of secondary copyright liability, Plaintiffs' claim against Grande for contributory copyright infringement had four elements: (1) that Plaintiffs own or have exclusive control over valid copyrights; (2) that those copyrights were directly infringed by Grande's subscribers; (3) that Grande had knowledge of its subscribers' infringing activity[7]; and (4) that Grande induced, caused, or materially contributed to that activity. *See Alcatel*, 166 F.3d at 790 (quoting *Gershwin Publ'g*, 443 F.2d at 1162).

The district court correctly ruled that Plaintiffs satisfied the first element as a matter of law. For the other three, the district court correctly interpreted the law and instructed the jury on the relevant legal standards in light of the factual issues disputed by the parties, and Plaintiffs introduced ample evidence from which a reasonable jury could find in Plaintiffs' favor. Accordingly, there is no basis to disturb the jury's finding that Grande is liable.

---

[7] Willful blindness can satisfy the requirement of actual knowledge. *See infra* at 34 n.11.

**A.    The District Court Correctly Concluded As A Matter Of Law That Plaintiffs Own Or Exercise Exclusive Control Over The Copyrights At Issue, And Grande Does Not Argue Otherwise.**

It is undisputed that Plaintiffs own or exercise exclusive control over every sound recording copyright at issue in this case (the "works in suit").

At summary judgment, Plaintiffs submitted declarations establishing the chains of title by which they came to own or exclusively control the copyrights in each work in suit.  ROA.4316-36; ROA.4472-82; ROA.4947-62.  Grande did not dispute the validity of this evidence on the merits.  ROA.6426.  Accordingly, the district court held that Plaintiffs' unrebutted evidence was "sufficient to prove ownership" as a matter of law and did not include ownership as an issue of fact remaining to be resolved in the case.  ROA.6428-29.

The district court reaffirmed this ruling multiple times.  In ruling on the parties' motions *in limine* before trial, the district court confirmed that it had "already ruled on ownership" and held that "[o]wnership is not a remaining issue for trial."  ROA.8198.  The district court also indicated at the jury charge conference that there was "no question" that Plaintiffs own or control the works in suit.  ROA.13381.

Further, when addressing Grande's oral motion for judgment as a matter of law, the district court reaffirmed these prior rulings, determining that "there's not been one shred of evidence anywhere that the plaintiff in this case did not -- plaintiffs in this case don't own those copyrights." ROA.13488.

Grande does not dispute the merits of any of these rulings or the sufficiency of Plaintiffs' evidence to prove ownership as a matter of law. Indeed, consistent with the district court's analysis, Grande has **never** identified any facts undermining Plaintiffs' proof on this issue. Thus, and unsurprisingly, Plaintiffs' ownership of the copyrights at issue is not addressed anywhere in Grande's statement of issues presented for review in this appeal or in the legal arguments in Grande's brief.

Nevertheless, in the procedural history section of its brief, Grande criticizes the process by which the district court ruled on this issue. *See* Br. at 8. That criticism is irrelevant to any issue raised on appeal. It also omits the critical facts on which the district court based its ruling and fails to identify any evidence challenging the sufficiency of Plaintiffs' proof. Given the irrelevance of this issue on appeal and Grande's distortion of how the district court resolved the issue below, it

is obvious that Grande raised this issue hoping that it might make the

Court skeptical of Plaintiffs' claim more generally or otherwise

improperly bias this Court against the merits of the district court's

other rulings. This Court should ignore that transparent effort.

## B.   The Jury Was Presented With Overwhelming Evidence Of Direct Infringement At Trial.

Grande's main defense at trial was that Plaintiffs' evidence of

direct infringement was unreliable. However, the trial record amply

supported the jury's determination that Grande's subscribers directly

infringed Plaintiffs' copyrights.

For each copyrighted sound recording at issue, Plaintiffs

introduced testimony and documentary evidence that: (1) Rightscorp

reached an agreement with a Grande subscriber to distribute the work,

ROA.11751-52; ROA.12084-86; ROA.12094-95; (2) Rightscorp sent

Grande a notice of infringement documenting that agreement,

ROA.11752; ROA.12109-10; and (3) Rightscorp re-approached Grande

subscribers who had previously agreed to distribute the work and

obtained at least one (and usually more than one) complete copy of the

work from those Grande subscribers, ROA.11752.[8]  All of the

infringement notices that Rightscorp sent Grande and all of the

infringing copies of Plaintiffs' works that Rightscorp downloaded from

Grande's subscribers were admitted into evidence.  ROA.45862-78134;

ROA.79124-81095.

Further, Plaintiffs presented evidence that the RIAA analyzed the

files Rightscorp downloaded from Grande's subscribers to confirm that

they were in fact copies of Plaintiffs' sound recordings.  To do this, the

RIAA used an industry-standard software program called Audible

Magic, which forensically analyzes the contents of digital audio files to

determine if those files match the contents of files in a database that

contains authorized authentic copies of Plaintiffs' sound recordings.

ROA.11670-71.  An RIAA employee testified that over the course of his

---

[8] The jury also heard testimony that data contained within the files Rightscorp downloaded from Grande's subscribers verified the accuracy of Rightscorp's notices. The processes by which Rightscorp generated notices and obtained downloads were both based on searching for the same underlying "hash value" by which the works in suit could be identified on BitTorrent.  ROA.11743-56.  A "hash value" is a unique "long string of letters and numbers" that is "generated mathematically based on the contents" of a particular digital file.  ROA.12046.  Because different files contain different hash values, when two files contain the same hash value, one can be confident that the two files are the same.  ROA.12048.  Indeed, one of Plaintiffs' expert witnesses testified that the chances that two files with the same hash value are in fact two different files is so "infinitesimally small" that it is "one followed by 26 to 50 different zeros."  ROA.12048.

career, he has used Audible Magic "millions of times" to determine

whether digital files downloaded from many different sources online are

actual copies of Plaintiffs' sound recordings in Audible Magic's

database.  ROA.11671-72.  In all that use, Audible Magic never made a

mistake in identifying the contents of a digital file.  ROA.11675-76.

Indeed, one of Plaintiffs' experts offered unrebutted testimony that

Audible Magic's error rate in identifying the contents of digital audio

files is approximately one in three billion.  ROA.13190-91.[9]

Here, Audible Magic's analysis confirmed that Rightscorp's files

included at least one (and usually more than one) actual copy of each

work in suit.  ROA.11676-79.  All of the records generated by the

Audible Magic analysis were admitted into evidence.  ROA.86197;

ROA.335181-336306.

Finally, each Plaintiff had an employee personally familiar with

Plaintiffs' sound recordings listen to a random sample of 50 Rightscorp

---

[9] As the district court recognized, Plaintiffs' use of Audible Magic to confirm that the digital files at issue were copies of their copyrighted works is a well-established practice in large-scale copyright infringement cases such as this one.  ROA.6404-05. Other courts have recognized that Audible Magic's technology is "industry-recognized" and "has been repeatedly used in entertainment copyright cases and thus, its methods are well-known to those within the entertainment industry." *UMG Recording, Inc. v. Escape Media Grp., Inc.*, No. 11 Civ. 8407, 2014 WL 5089743, at \*17, \*20 (S.D.N.Y. Sept. 29, 2014) (collecting cases).

downloads.  Those employees testified and confirmed for the jury that the files they listened to were in fact copies of the sound recordings that Audible Magic identified and were owned by their respective companies. ROA.12790-91 (Universal); ROA.11634 (Sony); ROA.12549 (Warner).

Grande does not challenge any of that evidence.  *See* Br. at 55-56, 56 n.15.  Instead, it claims that all that evidence is still insufficient to prove direct infringement because Plaintiffs did not take the additional step of introducing separate copies of their sound recordings from their records into evidence so the jury could compare Rightscorp's downloads against Plaintiffs' copies.  *See id.* at 53-56.  However, given the robust factual record described above, no such evidence was required.

In this case, there was no genuine dispute that the files Rightscorp downloaded were copies of Plaintiffs' sound recordings. Most significantly, the RIAA's Audible Magic analysis—which compared Rightscorp's downloads to Plaintiffs' authentic recordings— confirmed this fact.  The jury was entitled to rely on the records generated by Audible Magic identifying Plaintiffs' matching copyrighted sound recordings and the unrebutted testimony offered by Plaintiffs that Audible Magic's error rate is approximately one in three billion.

31

While Grande argues that it lacked the opportunity to "identify any mismatches" in Audible Magic's analysis, Br. at 55, such an assertion is demonstrably untrue.  Grande had ample opportunity during the years that this case was litigated to compare the files Rightscorp downloaded to authentic copies of Plaintiffs' sound recordings.[10]  The sound recordings at issue in this case are some of the most famous musical recordings in the world and include recordings by artists such as Willie Nelson, George Strait, Aerosmith, Adele, and Beyoncé, among many others.  ROA.339110, 339114; ROA.339848-49; ROA.340222; ROA.12789.  Plaintiffs make authentic copies of these recordings commercially available to the public through widely accessible streaming services like Spotify and Apple Music.  ROA.11619; ROA.11657; ROA.12788; ROA.12548-49.  At any time since Rightscorp's downloads were produced in discovery, Grande could have compared those files to Plaintiffs' authorized commercially available

---

[10] Indeed, Grande made such a comparison, but chose not to offer the results to the jury.  Before trial, one of Grande's experts reviewed Audible Magic's analysis and asserted in one of his reports that he had listened to some of Rightscorp's downloads and determined that Audible Magic had misidentified them.  However, at trial, that same expert did not offer that opinion and instead agreed on cross-examination that if the files that Rightscorp downloaded were analyzed by Audible Magic and confirmed to match Plaintiffs' sound recordings, it was true that Rightscorp had obtained copies of Plaintiffs' copyrighted works.  *See* ROA.13330.

recordings and raised any issues it could identify.  It never identified any such issues to the jury.

Those facts readily distinguish this case from the two authorities on which Grande relies.  *See Bridgmon v. Array Sys. Corp.*, 325 F.3d 572 (5th Cir. 2003); *King v. Ames*, 179 F.3d 370 (5th Cir. 1999).  In both of those cases, the parties genuinely disputed whether the defendants' alleged copies were substantially similar to the plaintiffs' alleged works, and the only evidence about the contents of the plaintiffs' works was the oral testimony of the plaintiffs themselves.  *See Bridgmon*, 325 F.3d at 576; *King ex rel. King v. Ames*, No. 95-CV-3180, 1997 WL 327019, at *5-6 (N.D. Tex. June 4, 1997).  Given that context, the plaintiffs could not satisfy their burdens to prove that the defendants' alleged copies were substantially similar to the plaintiffs' alleged works merely by asking the jury to credit the plaintiffs' oral testimony.  *See Bridgmon*, 325 F.3d at 576; *King*, 179 F.3d at 375-76.  Those holdings are inapposite here, where Plaintiffs introduced extensive, forensically reliable evidence proving that the files Rightscorp downloaded were exact copies of Plaintiffs' sound recordings and that Grande had ample opportunity to identify any mismatches for the jury (though there were none).

33

Accordingly, the district court was correct to distinguish *Bridgmon* and *King* and hold that Plaintiffs' Audible Magic evidence was a sufficient foundation upon which a jury could conclude that Rightscorp's downloads were in fact copies of Plaintiffs' works. ROA.6401-08.

### C.    The District Court Applied The Correct Legal Standard For Contributory Infringement, And Plaintiffs Presented Sufficient Evidence Of Such Infringement At Trial.

Plaintiffs based their case on longstanding principles of contributory copyright infringement derived from the common law. Those principles counsel that a defendant is liable if it: (1) had knowledge of specific instances of direct infringement by third parties,[11] and (2) induced, caused, or materially contributed to that infringement. *See Alcatel*, 166 F.3d at 790. This Court has expressly embraced this theory of liability. *See id.* Thus, the district court was correct to permit Plaintiffs to pursue this theory at trial and to instruct the jury on its elements.

---

[11] As the district court properly recognized, willful blindness "can also satisfy" the knowledge requirement. *See* ROA.6418 n.7. Grande does not challenge this ruling on appeal.

The trial evidence amply supported the jury's verdict that Grande is contributorily liable. The record demonstrated that: (a) from the early 2000s, Grande had a policy to address the conduct of infringing subscribers; (b) Grande eliminated that policy in 2010 and replaced it with a policy not to terminate any subscribers for copyright infringement no matter how many times they infringed; (c) beginning in 2011, Grande received millions of infringement notices from Rightscorp, making it aware of specific infringements by specific subscribers; and (d) thereafter, for nearly seven years, Grande continued to provide its high-speed internet services to subscribers it knew were infringing. *See supra*, at 11-16, 12 n.2. Indeed, Grande maintained its policy even though one of its employees raised doubts about its legality in 2013 and even after Grande became aware in 2015 that another ISP (Cox Communications) had been found liable for contributory infringement in a case based upon Rightscorp's notices. *See supra*, at 14-15. Grande did not resume terminating subscribers for copyright infringement until after Plaintiffs initiated this action. *See supra*, at 15-16.

Given that record, there is nothing surprising about the jury's verdict. Grande had specific knowledge of who its infringing

subscribers were, and yet it chose to continue providing those subscribers with the very tools they required to continue infringing. That is sufficient to prove contributory infringement under the law. *See BMG Rights Mgmt.*, 881 F.3d at 308.

The jury's verdict was also the only equitable result in this case. As explained above, an ISP like Grande is the ***only party*** capable of matching infringing IP addresses to its individual subscribers. *See supra*, at 7-9. Accordingly, when ISPs obtain knowledge that their subscribers are repeatedly using their services to infringe and make the choice to continue providing their services to those subscribers, copyright owners are left with no means to address the massive amount of infringements that have jeopardized their businesses.

To underscore the importance of ISP participation in the process, Congress incentivized ISPs to cooperate with copyright owners trying to stop infringements online by giving ISPs a complete defense to damages claims for copyright infringement so long as they take minimal steps to

address repeat infringers. *See supra*, at 10-11.[12]  Grande did not take those minimal steps.

In light of these facts and equities, the primary relief Grande seeks in this appeal—a ruling that Grande cannot be liable for contributory infringement as a matter of law—would dismantle the doctrine of contributory copyright infringement and leave copyright owners with no remedy to address the massive online infringements that have dramatically impacted their businesses and property and were directly enabled by the knowing provision of high-speed internet

---

[12] At trial, the district court admitted evidence of Grande's contemporaneous knowledge of the availability of the Section 512 safe harbor defense and its failure to qualify for that defense in this case.  While Grande spends substantial space in its brief complaining about Plaintiffs' use of that evidence, those complaints are wholly irrelevant because Grande does not contend on appeal that the district court erred in admitting that evidence.  *See* Br. at 48-50.  Moreover, those criticisms are premised on a demonstrably disingenuous presentation of the trial record.  *See id.* at 50.  Indeed, when Grande made similar arguments in its post-trial motion, the district court criticized Grande for taking this portion of the trial transcript "out of context."  ROA.11048-49 & n.11.  While Grande asserts that Plaintiffs improperly argued at closing that Grande is liable because it did not qualify for the safe harbor defense, Grande omits that: (a) Plaintiffs' argument was a direct response to an argument Grande raised in its closing, namely that compliance with the safe harbor provision was "optional," ROA.13611, 13614; and (b) the portion of the trial transcript Grande cites was merely a transition to Plaintiffs' express acknowledgement and analysis of the elements of a contributory infringement claim, *see* ROA.13619.

service by an ISP to known infringers.[13]  Grande provides no credible

argument as to why such a result is supported at law or would be just.

Moreover, the legal arguments Grande makes in support of its

effort to justify this radical departure from traditional applications of

common law principles are all unpersuasive.

> **1.    Materially Contributing To Direct Infringement Has Always Been A Valid Basis For Contributory Infringement.**

When this Court recognized the validity of claims for contributory

copyright infringement, it adopted the elements of the claim from the

Second Circuit's seminal decision of *Gershwin Publishing Corp. v.*

*Columbia Artists Management, Inc.  See Alcatel*, 166 F.3d at 790 n.71.

*Gershwin* recognized that contributory infringement claims stem from

---

[13] Grande's *amici*—though, notably, not Grande itself—suggest that copyright owners can always serve subpoenas on ISPs to identify infringing IP addresses and then pursue direct infringement cases against those individuals.  *See Amici* Br. at 19.  That solution is completely impractical to address the massive volume of infringements that an ISP like Grande facilitates, and would needlessly and pointlessly clog the already-overcrowded dockets of district courts.  Moreover, it is virtually certain that ISPs who refuse to address repeat infringement would not cooperate when they receive subpoenas.  Here, it is notable that Grande in particular does not make the argument advanced by its *amici*.  In 2014, Rightscorp served a subpoena on Grande in an effort to identify some of Grande's infringing subscribers.  Rather than work collaboratively with Rightscorp to address the issue, Grande moved to quash the subpoena.  *See* Mot. to Quash, *Grande Communications Networks LLC v. Rightscorp, Inc.*, No. 14-mc-00848 (W.D. Tex. Sept. 5, 2014), ECF No. 1.

"the common law doctrine that one who knowingly participates [in] or furthers a tortious act is jointly and severally liable with the prime tortfeasor." *Gershwin Publ'g*, 443 F.2d at 1162 (citation omitted). The court in *Gershwin*—and this Court in *Alcatel*—synthesized that common law principle into a rule that "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Id.*; *see Alcatel*, 166 F.3d at 790 & n.71 (quoting *Gershwin*).

Grande seeks to rewrite this standard and eliminate material contribution from the law of contributory infringement. *See generally* Br. at 22-29, 35-38. Since no court has ever reached such a radical conclusion, Grande bases its argument on an inaccurate presentation of three U.S. Supreme Court opinions: *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), and *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). However, none of those opinions holds or even implies that knowingly providing material contribution to infringement is an inadequate basis for a finding of contributory copyright liability.

### a. *Sony* And *Grokster* Did Not Write Material Contribution Out Of The Law.

Grande's primary argument is that *Sony* and *Grokster* articulate the "only" grounds pursuant to which a defendant can be held liable for contributory infringement, and those grounds do not include knowingly providing material contribution.  Br. at 22.  However, neither case holds or even implies that the Supreme Court limited contributory infringement in that way.  Rather, *Sony* and *Grokster* merely analyzed the theories of liability relevant to the particular facts presented in those cases.  Moreover, in both cases the Court expressly embraced the common law standards for contributory infringement and acknowledged more generally that cases based on different factual circumstances would require different applications of those standards.

In *Sony*, the Court addressed the issue of when the manufacturer and distributor of a product (there, the Betamax video tape recorder) could be held secondarily liable for subsequent copyright infringements committed by users of that product.  *See* 464 U.S. at 420.  The question presented to the Court was whether selling a product that facilitated infringement, standing alone, was sufficient to impose contributory

copyright liability.  The Court held it was not, so long as the product was "capable of substantial noninfringing uses."  *Id.* at 442.

The Court's analysis in *Sony* focused on the fact that the case involved the sale of a product, because in such a case, the defendant's contact with its customers ended at the "moment of sale" and the defendant did not know what its customers did with the product thereafter.  *Id.* at 437-38.  Accordingly, any liability had to be premised solely on the defendant's "constructive knowledge" of how its customers might use the product in the future.  *Id.* at 439.  *Sony* therefore stands only for the narrow proposition that a defendant's mere sale of a product capable of infringing is not sufficient to establish the defendant's knowledge of its customers' future infringing activity when the product is also capable of noninfringing uses.

*Sony* did not limit—or even address—the scope of contributory liability generally or criticize or limit the controlling principles derived from common law.  To the contrary, the Court expressly contrasted the type of case before it (*i.e.*, one involving the sale of a product) with one in which the defendant might have an "ongoing relationship" with its infringing customers beyond the moment of sale.  *Id.* at 437.  Indeed,

the Court expressly noted that in an "ongoing relationship" case (such as this case, as discussed below), its analysis would be different and specifically cited *Gershwin*, among other authorities. *See id.* & n.18.

*Grokster* is even less helpful to Grande as that case actually **expanded** the scope of secondary infringement. Like *Sony*, *Grokster* addressed a defendant that distributed a product that facilitated infringement—specifically, software that enabled users to share digital files through a P2P network. *See* 545 U.S. at 919-20.[14] Thus, the Court again faced the question of whether it was appropriate to impose secondary liability when the defendant's relationship with its customers ended at the moment of sale and the defendant lacked knowledge of how its customers used its product in the future. Purporting to apply *Sony*, the Ninth Circuit had held that the defendant was entitled to summary judgment because the software was capable of noninfringing uses. *See id.* at 932-34.

However, the Supreme Court reversed, holding that while *Sony* prohibited "imputing culpable intent" from the distribution of the

---

[14] As noted above, *see supra*, at 7, BitTorrent lacks a centralized corporate entity that could be sued as Grokster was.

product alone, it did not "displace other theories of secondary liability" or require courts to ignore other evidence of the defendant's intent. *Id.* at 934. Because the record in *Grokster* contained evidence that the defendant distributed the software "with the object of promoting its use to infringe copyright" (*i.e.*, to "induce" its customers' infringements), summary judgment in the defendant's favor was not warranted. *Id.* at 936-37.

By holding that the distributor of a product that facilitates infringement can be liable when it induces future infringements after the moment of sale, *Grokster* ***expanded*** the doctrine of contributory infringement. Before *Grokster*, the distributor of a product could not be liable for future infringements so long as the product was capable of "substantial noninfringing uses." *Sony*, 464 U.S. at 442. But after *Grokster*, an inducement claim could succeed against the distributor of a product if the distributor affirmatively induced future infringements, even if the product was capable of substantial noninfringing uses. *See Grokster*, 545 U.S. at 936-37. In other words, *Grokster* made it possible for a plaintiff suing the distributor of a product to prevail by proving the distributor induced future infringements rather than by proving the

distributor had specific knowledge of future infringements. That development in the law was critical in subsequent cases involving the distribution of products that facilitate infringement, as it is difficult if not impossible to prove that the defendants in those cases knew about its customers' future infringing uses after the moment of sale.

Of course, this case does not involve the distribution of a product. Rather, Grande provides its subscribers with internet services on a continuous basis in exchange for regular monthly subscription fees. ROA.12403; ROA.12593; ROA.12751. Those actions create an "ongoing relationship" between Grande and its infringing subscribers that extends beyond a single moment of sale. *Sony*, 464 U.S. at 437. Accordingly, Plaintiffs' theory of liability in this case is not based on Grande's knowledge about its subscribers' likely future activities after the moment of sale, but rather on Grande's knowledge of its subscribers' actual infringements based on its ongoing relationship with those subscribers. Because *Sony* and *Grokster* were expressly addressing records where such a continuing relationship did not exist, their holdings have no limiting effect on the theory of liability on which Plaintiffs here based their claim.

Given the facts of this case, Plaintiffs can plainly hold Grande liable for materially contributing to its subscribers' infringements. Indeed, a material contribution claim—which requires that a defendant provide its contribution with knowledge that it is being used to facilitate infringement—is ideally suited for a case like this one, where the defendant provides a service and has an ongoing relationship with its customers that enables it to know that subscribers are in fact infringing. *See Sony*, 464 U.S. at 437 n.18. Accordingly, multiple courts that have considered this basis for liability against ISPs have held that it continues to exist after *Grokster* just as it did before. *See, e.g.*, *BMG Rights Mgmt.*, 881 F.3d at 306-07; *BMG Rights Mgmt. (US) LLC v. Altice USA, Inc.*, No. 22-CV-00471, 2023 WL 3436089, at *12 (E.D. Tex. May 12, 2023); *UMG Recordings, Inc. v. RCN Telecom Servs., LLC*, No. 19-cv-17272, 2020 WL 5204067, at *8-9 (D.N.J. Aug. 31, 2020). Indeed, no court has ever held that *Grokster* eliminated secondary liability based on material contribution as Grande contends.[15]

---

[15] Because Grande ignores the distinction between selling a product and providing an ongoing service, it argues that if the material contribution standard survived *Grokster*, there would be no need for *Grokster*'s inducement standard of liability. *See* Br. at 28-29. However, as explained above, the two are built for different purposes. This distinction is made evident in a case Grande cites in its brief, where a district court considered a claim against a website that merely distributed P2P

Ignoring all that context, Grande misinterprets *Grokster* as somehow narrowing the doctrine of contributory infringement so it applies ***only*** when a plaintiff can prove that a defendant subjectively intended to induce future infringements, regardless of whether the case at hand involves the distribution of a product or the ongoing provision of a service. *See* Br. at 22-29.[16]  However, the entire premise of Grande's argument is contrary to the expansive approach the Court took to contributory infringement in *Grokster* itself.  Further, in reaching its holding in *Grokster*, the Court expressly embraced the broader "common law principles" from which contributory infringement emerged, citing *Gershwin* approvingly.  545 U.S. at 930-31.  The Court would not have framed its decision as arising out of and furthering such broader principles if the Court was seeking to limit the grounds by which defendants could be held contributorily liable.

---

software and let the plaintiffs' inducement claim proceed to discovery while dismissing the plaintiffs' material contribution claim.  *See David v. CBS Interactive Inc.*, No. 11-cv-9437, 2012 WL 12884914, at *3-5 (C.D. Cal. July 13, 2012); *see also* Br. at 47.

[16] While Grande also claims that the jury should have been instructed about the noninfringing uses of having access to the internet, *see* Br. at 41, potential noninfringing uses are not relevant in a case involving the ongoing provision of a service.  *See BMG Rights Mgmt.*, 881 F.3d at 305-07.  Here, Grande had actual knowledge of its subscribers' infringements and so the potential for lawful use of the service by other users is wholly irrelevant.

Given that *Grokster* did not hold, suggest, or even consider the radical limitation on contributory infringement that Grande now proposes, Grande's entire argument rests on the fact that the opinion in *Grokster* did not expressly mention material contribution when it cited *Gershwin*. *See* Br. at 28. However, that absence is irrelevant, as the Court merely cited the grounds directly relevant to the dispute at hand. *See* 545 U.S. at 930-31. Nothing required the Court to list every theoretically possible basis for relief, regardless of whether those bases were at issue. Grande's argument also ignores that in *Grokster*, the Court expressly endorsed the broader common law theories of contributory liability articulated in *Gershwin* and other authorities. *See id.* If the Court had intended to write those theories out of the law or limit them, it would have said so.

Accordingly, neither *Sony* nor *Grokster* undermined a plaintiff's ability to pursue a contributory infringement claim when, as here, a defendant knowingly provides material contribution to infringement.

> ### b.  *Twitter* **Does Not Address The Issue At Hand Or Absolve Grande Of Liability.**

Without any cases addressing copyright infringement that support its radical attempted rewriting of the law of contributory infringement,

Grande and its *amici* attempt to find some support from the Supreme Court's opinion last Term in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). *See* Br. at 35-38; *Amici* Br. at 6-15 (making the same arguments Grande does). However, *Twitter* did not involve copyright law and the Court's reasoning actually supports Plaintiffs' position here.

As a threshold matter, *Twitter* was litigated pursuant to the Justice Against Sponsors of Terrorism Act and does not even mention copyright law. Thus, if this Court determines that material contribution remained a viable theory of secondary copyright infringement after *Grokster*, nothing in *Twitter* should alter that conclusion. To rule otherwise would require this Court to conclude that the Supreme Court changed fundamental principles of copyright liability without saying so in a case that was not about copyrights.

More important, the reasoning in *Twitter* underscores the propriety of holding Grande liable here. As discussed below, *Twitter* underscores the general importance, in all cases of secondary liability, of demonstrating a direct nexus between the defendant's conduct and the underlying tort at issue. While that nexus was absent in *Twitter*, it

is demonstrably present here as Grande's conduct directly enabled and facilitated continued copyright infringement by its subscribers.

In *Twitter*, family members of a victim of an ISIS terrorist attack in Istanbul, Turkey sued three U.S. social media companies, alleging that the companies aided and abetted ISIS by permitting its members to use the platforms for "recruiting, fundraising, and spreading their propaganda." 598 U.S. at 479, 481. The Court held that aiding-and-abetting liability (which also derives from common law principles of secondary liability) requires courts to focus on the defendant's "assistance to the tort for which plaintiffs seek to impose liability." *Id.* at 506. In *Twitter*, the relevant underlying tort was the Istanbul terrorist attack. Because the defendants did not knowingly provide ISIS any assistance relating to the commission of that attack, they could not be liable on an aiding-and-abetting theory. *Id.* at 506-07.

In reaching its holding, the Court concluded that aiding-and-abetting claims are strongest when there is a "direct nexus" between the defendant's conduct and the underlying tort. *Id.* at 506. When such a "direct nexus" exists, courts and juries alike can "more easily infer" that the defendant's conduct—especially if done with knowledge of the

49

tort—was "culpable." *Id.* By contrast, when no direct nexus exists, plaintiffs alleging aiding-and-abetting claims must instead show "participation through intentional aid" in order to generate the same inference of culpability. *Id.* Because the plaintiffs in *Twitter* could not allege a direct nexus between the social media companies' services and the particular terrorist attack for which they sought relief, their claim could not survive absent evidence the companies intentionally supported ISIS, which they did not.

In sharp contrast to the facts in *Twitter*, the nexus between Grande's conduct and the tort for which Plaintiffs seek redress is **direct**. The underlying tort at issue here is copyright infringement— specifically the massive unauthorized distribution of Plaintiffs' copyrighted sound recordings by Grande's subscribers. It is beyond dispute that Grande provided those subscribers with the very tools necessary to conduct those infringements (high-speed internet access) and even continued doing so after learning that those subscribers were repeatedly using those tools to infringe. Unlike in *Twitter*—where ISIS did not use the social media companies' services to complete its terrorist attack—this case involves tortfeasors that directly relied on and used

50

Grande's services to carry out their torts.[17]  Thus, the verdict here is completely consistent with the Court's holding in *Twitter*; the direct nexus between Grande's conduct and the tort at issue permits an inference that Grande's knowing provision of internet services to infringing subscribers was actionable.[18]

Grande and its *amici* present a simplistic and demonstrably inaccurate interpretation of *Twitter*.  According to them, the case is relevant because it absolved social media companies of a claim for secondary liability even when they were allegedly closer to "online activity" than an ISP like Grande.  Br. at 35; *see also Amici* Br. at 9-10. However, as noted above, the relevance, if any, of *Twitter* relates to the connection of the social media companies to the underlying tort for which the plaintiffs sought relief.  As the Supreme Court explained, the

---

[17] This distinction also distinguishes *Perfect 10, Inc. v. Visa International Service, Ass'n*, 494 F.3d 788 (9th Cir. 2007), on which Grande relies.  *See* Br. at 33-34, 46-47. There, the court held the defendant could not be liable because its conduct had "no direct connection" to the underlying copyright infringement, which would have occurred regardless of whether the defendant provided its services to the tortfeasor or not.  *Perfect 10, Inc.,* 494 F.3d at 796.  That is not the case here.

[18] This conclusion is also fully consistent with the district court's ruling at summary judgment, where it held that it was "beyond debate" that Grande's continued provision of internet services to infringing subscribers facilitated access to infringing materials online and that such conduct, if done with knowledge that it would result in future infringements, gave rise to an inference of culpable intent. ROA.6418-19.

relevant issue was not whether ISIS used the defendants' social media services, but rather whether there was any connection between the defendants' conduct and the underlying tort at issue. That nexus was missing in *Twitter* but is plainly present here.

Accordingly, if *Twitter* has any relevance to this case, it supports Plaintiffs' theory of liability rather than refutes it. Indeed, *Twitter* reaffirms the common law principle that defendants who directly aid in the commission of torts with knowledge that they are doing so can be held liable for their culpable conduct. That is precisely the basis for which Plaintiffs seek to hold Grande accountable.

> **2.   The District Court Properly Interpreted And Instructed The Jury On Plaintiffs' Material Contribution Claim.**

Having properly held that Grande could be liable for knowingly providing material contribution to its subscribers' infringements, the district court also properly instructed the jury on what factual findings were necessary to impose liability in this case.

The starting point for any discussion of material contribution is the established principle that ISPs provide a material contribution to infringements by their subscribers when they knowingly provide

infringing customers with the necessary tools to infringe—in particular, a high-speed connection to the internet.

Lacking any response to the dispositive case law establishing that principle, Grande attempts to find a basis for reversal in some case law involving new technologies where courts have added an additional element of proof—whether the defendant has taken simple measures to prevent further damage to copyrighted works—before imposing liability.

In this case, it was undisputed that Grande continued to provide its infringing customers with the tools they needed to continue infringing. Thus, the district court would have been correct in instructing the jury that Plaintiffs established this element of liability as a matter of law. However, at summary judgment the district court also recognized the second line of cases. To be consistent with the district court's summary judgment ruling and avoid creating needless appellate issues, Plaintiffs sought and the district court provided an additional instruction asking the jury whether Grande had simple measures at its disposal to avoid future damage before imposing

liability.  Doing so plainly favored Grande and is not a basis for Grande

to seek reversal.

>    **a.     It Is Undisputed That Grande Provided Infringing Subscribers With The Tools Necessary To Continue Infringing.**

When, as here, a contributory infringement claim is premised on

the defendant's ongoing provision of a service (rather than its sale of a

product), material contribution can be demonstrated when a defendant

provides infringing subscribers with the tools necessary to continue

infringing.  *See BMG Rights Mgmt.*, 881 F.3d at 308; *see also Louis

Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 943-44 (9th

Cir. 2011) (holding there was "no question" that providing direct

infringer with server space was material contribution because having

server space was "an essential step in the infringement process"

(citation omitted)).

In *BMG Rights Management*, the Fourth Circuit considered a

contributory infringement claim almost identical to this one, arising out

of an ISP's continued provision of internet services to known infringing

subscribers.  *See* 881 F.3d at 298-300.[19]  The court held that in a case

involving "subscription services" like those provided by an ISP, liability

could be imposed if the service provider learns that its customers are

using its services to infringe and "nonetheless renews the lease to those

infringing customers."  *Id.* at 308.  That ruling was appropriate because

in that circumstance, the continued provision of services "is

substantially certain to result in infringement, and so an intent to cause

infringement may be presumed."  *Id.*; *see also Grokster*, 545 U.S. at 932

(noting that a person "will be presumed to intend the natural

consequences of his acts") (citation omitted); *Restatement (Second) of

Torts* § 8A cmt. b (1965) (acknowledging that if a person "knows that

the consequences are certain, or substantially certain, to result from his

act, and still goes ahead, he is treated by the law as if he had in fact

desired to produce the result").

Applying that standard, Grande's material contribution has

always been manifest and undisputed.  Grande has never claimed in

this litigation that it stopped providing its services to infringing

---

[19] In fact, *BMG Rights Management* is the appeal that followed from the 2015 trial against Cox Communications premised on its receipt of Rightscorp's notices, of which Grande was contemporaneously aware.  *See supra*, at 15.

subscribers during the relevant time period.  That is why, at summary judgment, the district court determined that Grande's material contribution was "clear" and that the real "question" was whether Grande provided its services knowing that its customers were using them to infringe.  ROA.6419.[20]

The evidence adduced at trial further confirmed that Grande continued to provide subscribers it knew were infringing with the very tools necessary to infringe.  Grande's witnesses consistently testified that Grande's policy during the relevant time period was never to terminate the services of subscribers for copyright infringement, no matter how frequently the subscribers infringed.  *See supra*, at 12-16.  Grande's conduct was so clear that its corporate representative at trial flatly conceded that if the jury found "that infringements reflected in a notice actually occurred, then Grande was continuing to provide Internet service to users who were, in fact, guilty of infringement of which [Grande] had received copyright notices."  ROA.12893.  Based on the consistency of the trial evidence, the district court determined that

---

[20] The jury determined Grande did act with such knowledge, and Grande does not contest that finding on appeal.

there was "no question that [Grande] intentionally continued to provide Internet service" to its infringing subscribers.  ROA.13381.

Grande does not contest any of these findings on appeal.[21]

> **b.    The Court's Instruction Requiring The Jury To Find That Simple Measures Were Available To Grande To Prevent Further Damage To Copyrighted Works Favored Grande And Is Not A Basis For Grande To Seek Reversal.**

In some of its opinions in cases involving online infringements involving new technologies, the Ninth Circuit has imposed an additional step before allowing a finding of contributory copyright liability.  In these cases, even when the defendant provides the tools necessary for infringement, the court also inquires whether the defendant "can take simple measures to prevent further damage to copyrighted works."

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007)

---

[21] Grande's affirmative choice to continue providing its services to known infringing subscribers distinguishes this case from *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142 (9th Cir. 2018).  There, the Ninth Circuit considered a claim alleging that a subscriber of internet services who received infringement notices failed to "secure, police and protect" his account from third parties who used his internet access to infringe.  *Id.* at 1145-46.  The direct infringers were never identified.  *See id.* at 1145 n.1.  Because the pleading premised liability exclusively on the subscriber's failure to take action against unknown third-party infringers, it was insufficient to state a claim.  *See id.* at 1147-49.  Here, of course, Grande knew exactly who its infringing subscribers were but made the choice to continue to provide services to them anyway.

(cleaned up).  If such measures are available and the defendant does not take them, liability is appropriate.  *See id.* at 1172-73; *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1021-22 (9th Cir. 2001).  Conversely, if such measures are unavailable to the defendant, liability is inappropriate.  *See VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 745 (9th Cir. 2019); *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 671-72 (9th Cir. 2017).

Critically, this requirement favors ***defendants*** over copyright plaintiffs, as it imposes an additional burden on plaintiffs to identify a simple way the defendants could have avoided materially contributing to infringements in order to prevail.  Thus, in *Giganews*, the court ruled for the defendant, not because it failed to provide the tools necessary to infringe or lacked knowledge of infringing conduct, but because it found that the method proposed by the plaintiff by which the defendant could have prevented further damage to copyrighted works to be "onerous and unreasonably complicated."  847 F.3d at 671.  Similarly, the defendant in *VHT* prevailed not because it failed to provide tools for or lacked knowledge of direct infringement, but because while the plaintiff made three different proposals as to how the defendant could have prevented

further damage to copyrighted works, the court found them all insufficiently practical.  *See* 918 F.3d at 745-46.

Here, the district court considered these cases and held at summary judgment that, as a "rule of liability," ISPs like Grande can be liable if they have knowledge of specific infringing conduct and "can take simple measures to prevent further damages to copyrighted works," but fail to do so.  ROA.6418-20 (citation omitted).  Given this ruling, Plaintiffs sought and the district court delivered a jury instruction consistent with that determination.  ROA.9925.

At trial, Plaintiffs demonstrated that Grande indeed had a simple measure available to it: it could have stopped providing its services to subscribers who it knew repeatedly used those services to infringe. ROA.6418-20.  That simple action undoubtedly would have "prevent[ed] further damage" to Plaintiffs' "copyrighted works," as the subscribers who agreed to and in fact did distribute those works to Rightscorp would not be able to distribute them to other users on BitTorrent. *Amazon.com*, 508 F.3d at 1172.

Plaintiffs' proof was sufficient for two independent reasons.  First, federal copyright policy already identifies the termination of repeat

infringers as a core element of preventing infringement on online services. Pursuant to Section 512—which has been the law since the DMCA was enacted in 1998—ISPs like Grande are rewarded with the safe harbor defense *only if* they have and reasonably implement policies that provide "for the termination . . . of subscribers . . . who are repeat infringers." 17 U.S.C. § 512(i)(1)(A). Thus, any argument that terminating repeat infringing subscribers is not a simple measure available to Grande cannot be reconciled with the express provisions of the Copyright Act.[22]

Second, the trial record in this case provided the jury with a sufficient basis to conclude that Grande has always viewed the termination of subscribers as a simple measure available to it in appropriate circumstances. As noted above, Plaintiffs demonstrated at

---

[22] While Grande's *amici* argue that termination cannot be a simple measure because it would conflict with federal broadband policy, *see Amici* Br. at 15-19, that cannot be squared with Congress's express demand that online service providers terminate the accounts of repeat infringing subscribers as a threshold condition to qualify for Section 512's safe harbor defense. Grande's *amici* further argue that the requirements of Section 512 should be limited only to "the most egregious cases" to account for federal broadband policy. *Id.* at 18 n.18. But even if Section 512 was so limited—which itself would violate federal copyright policy—Grande is one of those "most egregious cases" because Grande's policy was *never* to terminate subscribers for copyright infringement, no matter how many times they infringed. *See supra*, at 12-16.

trial that, prior to the time period at issue in this case, Grande in fact had a process in place where it terminated the services of subscribers who engaged in copyright infringement. *See supra*, at 11-12.

It is also important to note that Grande itself has utilized termination as an effective tool to address behaviors of its subscribers that it finds unacceptable. As explained above, the trial record established that Grande consistently terminates the accounts of any subscriber who stops paying Grande's monthly bills. One of Grande's witnesses admitted at trial that Grande terminated non-paying subscribers 100% of the time and that, during the time period relevant to this case, Grande terminated "thousands" of subscribers for nonpayment. ROA.12738-39.[23] The jury was entitled to rely on those facts to determine that terminating subscribers' accounts was a simple measure available to Grande.

Grande contends that the district court's embrace of these "simple measures" cases was error for two principal reasons, but neither is

---

[23] While Grande and its *amici* extol the importance of the internet in modern society, they do not address Grande's strict policy to terminate the accounts of all subscribers who fail to pay Grande's subscription fees. *See* Br. at 39; *Amici* Br. at 15-19.

persuasive.  First, Grande argues that the entire line of "simple

measures" cases is inapposite because it applies only to defendants

"who directly control content online" because only such defendants "can

readily remove or disable access to specific infringing content."  Br. at

31.  However, the Ninth Circuit was clear in *Amazon.com* that it

designed this test broadly for "the context of cyberspace" and for any

defendant that provides "Internet access or services."  508 F.3d at 1171.

That breadth was reflected in the test itself, which does not ask

narrowly (as Grande claims) whether the defendant can remove access

to the infringing content online, but more generally whether the

defendant can "'prevent further damage' to copyrighted works."  *Id.* at

1172 (citation omitted).  Thus, Grande's purported limit on the scope of

these authorities is belied by the plain language of the cases

themselves.[24]

---

[24] Moreover, Grande's effort to draw a distinction between *Amazon.com*'s requirement that the defendant have "actual knowledge" of the infringing activity and the jury instructions' inclusion of willful blindness on this issue is baseless.  Br. at 34.  The Supreme Court has clearly held that people who willfully blind themselves to facts "in effect have actual knowledge of those facts."  *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011); *see also In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003) (holding that in secondary infringement case, "[w]illful blindness is knowledge").  Further, as noted above, Grande does not challenge the district court's willful blindness instruction on appeal.  *See supra*, at 34 n.11.

More important, even if Grande were correct that this line of cases is inapposite, the outcome would be that Plaintiffs are entitled to judgment as a matter of law.  As explained above, the simple measures test is an additional protection ***for defendants***.  Grande's underlying material contribution is undisputed and manifest from Grande's decision to continue providing its services to known infringing subscribers.  *See supra*, at 10-13.  Thus, if the availability of simple measures is irrelevant, then Grande materially contributed.  *See BMG Rights Mgmt.*, 881 F.3d at 308.

Second, Grande effectively seeks a ruling that it lacked simple measures available to it as a matter of law because it could not "locate the infringing content" online or control infringing activity on BitTorrent.  Br. at 45-47.  However, and as explained above, this is not a "take down" case in which Plaintiffs seek to hold Grande liable for hosting infringing content online.  Thus, whether Grande could remove unauthorized copies of Plaintiffs' sound recordings from the internet is irrelevant.  *See supra*, at 62.  Rather, the test is whether Grande could have employed simple measures to "prevent further damage to copyrighted works."  *Amazon.com*, 508 F.3d at 1172 (cleaned up).  By

terminating subscribers who repeatedly used its services to infringe, Grande could have.

### c.     The District Court's Jury Instruction Was Proper.

The district court instructed the jury that the material contribution standard would be "met" if it found that Grande failed to "take basic measures to prevent further damages to copyrighted works." ROA.9925. That was proper in light of the factual disputes in this case. *See Louis Vuitton*, 658 F.3d at 944 (holding district court did not err "by narrowing the instruction on material contribution to the only genuine question as to that element").

As noted above, it was uncontested that Grande provided the tools necessary for its subscribers to infringe. *See supra*, at 54-57. Thus, there was no factual dispute on that issue for the jury to resolve. The only issue left was whether Grande could have taken simple measures to prevent further damages to copyrighted works, but failed to take them. *See supra*, at 53-54. That is exactly what the district court instructed the jury to determine.

### 3. Plaintiffs' Trial Evidence Was Sufficient To Prove Material Contribution.

The evidence at trial demonstrated that Grande provided its subscribers with the tools necessary to infringe (high-speed internet access) and that Grande's subscribers used that tool to infringe Plaintiffs' copyrights. The evidence at trial also demonstrated that Grande had a simple measure available to it to prevent further damages to copyrighted works (terminating repeat infringing subscribers), but that Grande never took it. For all the reasons stated above, that is sufficient to prove material contribution.

While Grande claims that Plaintiffs' evidence was insufficient to prove material contribution, *see* Br. at 47-53, it ignores all of the dispositive evidence on which Plaintiffs relied. Instead, it selectively summarizes trial evidence that Plaintiffs sought to admit for entirely different purposes, such as to prove Grande's knowledge or willful blindness, to prove that Grande acted willfully for the purposes of statutory damages, or to address the various factors the jury had to consider in order to determine a statutory damages award. *See id.*[25]

---

[25] While Grande notes its objections to the admission of this evidence at trial, it does not challenge the district court's evidentiary rulings. Any such challenge would never prevail given the abuse of discretion standard that applies to such claims.

Because Grande does not dispute any of the evidence on which Plaintiffs actually relied to prove material contribution, there is no basis to conclude the jury lacked sufficient evidence to reach that conclusion.

*      *      *

In sum, because knowingly providing material contribution to infringement is a valid basis for contributory liability, because an ISP's continued provision of internet services to known infringing subscribers constitutes material contribution, and because the evidence at trial was sufficient to show that Grande engaged in exactly that conduct, there is no basis to reverse the jury's verdict that Grande is liable for contributory infringement simply because the district court gave Grande an additional opportunity to avoid liability—which the jury determined Grande did not qualify for.

---

*See Merritt Hawkins & Assocs., L.L.C. v. Gresham*, 861 F.3d 143, 152 (5th Cir. 2017).

## II.      There Is No Basis To Disturb The District Court's Ruling That Each Of Plaintiffs' 1,403 Sound Recordings Was Entitled To A Separate Statutory Damages Award.

The district court determined that each of Plaintiffs' 1,403 sound recordings that was infringed was entitled to an individual statutory damages award.  However, Grande contends that whenever more than one of those recordings appeared on the same album, Plaintiffs are entitled to only one statutory damages award for that album, regardless of how many individual recordings from the album were infringed.  The district court was correct.

The Copyright Act permits copyright owners to recover one statutory damages award "for all infringements involved in the action, with respect to any one work."  17 U.S.C. § 504(c)(1).  In this case, the evidence demonstrated that effectively all of the recordings at issue were exploited as individual, independent works in the marketplace for recorded music.  That undisputed fact was the basis for the district court's holding that each recording is an individual "work" for the purposes of Section 504(c)(1).

The Copyright Act also provides, that for the purposes of Section 504(c)(1), "all the parts of a compilation"—such as an album—

"constitute one work." *Id.* Accordingly, the issue presented is how many statutory damages awards are appropriate when a sound recording is exploited ***both*** individually and as part of an album.

While Section 504(c)(1) directs courts to award a separate statutory damages award for each "work" infringed in a case, it does not define what a "work" is. *See Sullivan v. Flora, Inc.*, 936 F.3d 562, 567 (7th Cir. 2019); *Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1116 (1st Cir. 1993). To fill this gap, courts have determined that, for the purposes of Section 504(c)(1), a "work" is a unit of original copyrightable expression that is capable of living its "own copyright life" in the marketplace. *Gamma Audio & Video*, 11 F.3d at 1116 (citations omitted). In making that determination, courts have evaluated whether the material that has been infringed has "independent economic value." *Id.* at 1116-17; *see also Sullivan*, 936 F.3d at 570-72.

Indeed, ***six*** circuit courts have endorsed this approach to resolving the definitional gap left open by the text of Section 504(c)(1). Each of these circuits has determined that, when copyrighted material has its own independent economic value in the marketplace at the time it is infringed, it constitutes a separate work for the purpose of determining

eligibility for statutory damages.  *See Sullivan*, 936 F.3d at 571-72;

*VHT, Inc.*, 918 F.3d at 747; *EMI Christian Music Grp., Inc. v.*

*MP3tunes, LLC*, 844 F.3d 79, 101 (2d Cir. 2016);[26] *MCA Television Ltd.*

*v. Feltner*, 89 F.3d 766, 769-70 (11th Cir. 1996); *Gamma Audio & Video*,

11 F.3d at 1117 & n.8; *Walt Disney Co. v. Powell*, 897 F.2d 565, 569-70

(D.C. Cir. 1990).[27]

It is easy to understand why this rule has been consistently

adopted.  When the evidence in a case shows that, at the time of

infringement, a work has "distinct and discernable value to the

copyright holder," it functions at that time as an individual work and

---

[26] Grande misleadingly argues that the law of the Second Circuit is otherwise, citing *Bryant v. Media Right Products, Inc.*, 603 F.3d 135 (2d Cir. 2010).  *See* Br. at 57-58. However, *Bryant* predated *MP3tunes* by six years and no longer accurately represents that circuit's law.  It should be noted that Grande was well aware of the *MP3tunes* decision before submitting its brief here, as the district court relied on it when denying Grande's post-trial motion on this very issue.  *See* ROA.11043-44.

[27] The Fifth Circuit has never released a published decision addressing this issue. Nevertheless, Grande cites one unpublished decision in which this Court held that a district court did not abuse its discretion in holding that a photographer who exploited a set of photographs as a "collection" could collect only one statutory damages award for infringement of that set.  *Cullum v. Diamond A Hunting, Inc.*, 484 F. App'x 1000, 1002 (5th Cir. 2012); *see* Br. at 58 n.16.  However, that case is consistent with the "independent economic value" test in that it considered how the plaintiff exploited the photograph collection in the marketplace at the time of infringement.  Further, while Grande notes that *Cullum* cited *Bryant*, Grande chose not to mention that *Cullum* was decided before the Second Circuit expressly reconsidered this issue in *MP3tunes* and departed from the approach it previously took in *Bryant*.  Thus, to the extent this Court has ever relied on *Bryant*, it did so without the benefit of *MP3tunes*.

not as part of a compilation.  *Sullivan*, 936 F.3d at 571; *see also*

*MP3tunes*, 844 F.3d at 101 (holding that when trial evidence

demonstrated that individual sound recordings on an album had been

exploited individually on the date of infringement, they could collect

individual statutory damages awards notwithstanding that they were

registered as parts of a single album).

In this case, Plaintiffs presented unrebutted evidence at trial that,

during the relevant time period, they exploited all but four of the works

in suit as individual economic units on streaming platforms like Spotify

and Apple Music and elsewhere in the digital marketplace.  *See*

ROA.11657-58; ROA.12788.[28]  Grande presented no rebuttal evidence

on this issue.

Thus, consistent with the reasoning of the relevant case law and

the uncontradicted evidentiary record, the court below properly held

that the 1,403 sound recordings at issue were individual works eligible

for separate statutory damages awards.  *See* ROA.11043-44.

---

[28] The four recordings that were not exploited individually were the "only recordings
from their respective albums at issue in the case."  ROA.10884 n.3.  Thus, they do
not affect the analysis.

Faced with such clear case law and uncontroverted trial testimony, Grande's only argument is that the copyright registrations that Plaintiffs obtained from the U.S. Copyright Office should constitute conclusive proof that their recordings were parts of compilations for the purposes of determining statutory damages eligibility for all future infringements, notwithstanding how the recordings were exploited in the marketplace. *See* Br. at 58-60. However, registration statements constitute only "prima facie evidence" of their facts at the time works are registered. 17 U.S.C. § 410(c). Thus, they do not dispose of the relevant inquiry, namely how the registered works were exploited in the commercial marketplace at the time of infringement. *See Gamma Audio & Video*, 11 F.3d at 1117 & n.8. On that inquiry, the district court appropriately relied on Plaintiffs' unrebutted trial testimony. *See* ROA.11043-44.

Accordingly, the district court's ruling that all 1,403 works in suit are eligible for individual statutory damages awards should be affirmed.

**III.  If The Court Remands This Case To The District Court For A New Trial, It Should Also Correct The District Court's Erroneous Jury Instruction Regarding Whether A Plaintiff Must Demonstrate An Actual Distribution To Prove Infringement Of Its Exclusive Right To Distribute Its Copyrighted Works.**

The Court should affirm the judgment below.  However, in the event the Court remands this case for a new trial, it should correct one error the district court made in its jury instructions regarding what conduct is necessary to prove Grande's subscribers directly infringed Plaintiffs' copyrights.[29]  In particular, the Court should clarify that taking affirmative steps to make a copyrighted work available for others to download online violates a copyright owner's exclusive right to distribute its work.  *See* 17 U.S.C. § 106(3) (exclusive distribution right).

The district court issued conflicting rulings on this issue.  At summary judgment, the district court surveyed the case law on this issue and determined that "the great weight" of authorities held that taking steps to make a work available for others to download constitutes direct infringement of the distribution right.  ROA.6408-10.

---

[29] Plaintiffs challenged the district court's instruction during the jury charge conference and reserved their rights on this issue.  *See* ROA.13365-71; ROA.10888 n.5.

However, when it came time to instruct the jury, the court said that direct infringement occurs only "by distributing" a work without authorization.  ROA.13517-18; ROA.9924; ROA.13365-71.

The district court was right the first time.  In *Napster*, the Ninth Circuit found the distribution right was infringed when users uploaded their file names to Napster's search index "for others to copy" later.  239 F.3d at 1014.  Further, both the Fourth and Tenth Circuits have held that when a library makes a work in its collection available for lending, that is all that is required to prove an infringement of the distribution right.  *See Diversey v. Schmidly*, 738 F.3d 1196, 1201-03 (10th Cir. 2013); *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 203 (4th Cir. 1997).  Thus, infringement occurs when a defendant takes sufficient affirmative steps to make a work available to the public, not when the evidence shows the work is actually disseminated to someone.

That rule should apply here.  There is little (if any) difference in conduct between a direct infringer taking the steps necessary to make a work available to the public online and the infringer actually transferring it.  Indeed, the act of making a work available is typically

the *final* affirmative act taken by an online infringer engaged in distributing a work without authorization, because once it is available anyone can download it. *See, e.g.*, *Napster*, 239 F.3d at 1014. Further, the harm to the copyright owner is accomplished once the work is made available because consumers seeking free access to copyrighted works online can obtain them whenever they want.

Accordingly, the majority of district courts that have considered this issue—including multiple district courts within the Fifth Circuit— have concluded that the act of making copyrighted works available online is sufficient to infringe the distribution right. *See, e.g.*, *Warner Bros. Records, Inc. v. Payne*, No. 06-CA-051, 2006 WL 2844415, at *3 (W.D. Tex. July 17, 2006); *Maverick Recording Co. v. Harper*, No. 07-CV-026, 2008 WL 11411855, at *3 & n.4 (W.D. Tex. Sept. 16, 2019), *aff'd in part and rev'd in part*, 598 F.3d 193 (5th Cir. 2010); *Universal City Studios Prods., LLLP v. Bigwood*, 441 F. Supp. 2d 185, 190-91 (D. Me. 2006); *Motown Record Co., LP v. DePietro*, No. 04-CV-2246, 2007 WL 576284, at *3 & n.38 (E.D. Pa. 2007). The district court relied on these decisions when it decided summary judgment, *see* ROA.6408-12,

but inexplicably departed from them when it came time to instruct the jury.

Accordingly, if this Court determines a new trial is required in this case (and it should not), the Court should correct the district court's error in instructing the jury as to the requisite conduct necessary to prove Grande's subscribers infringed Plaintiffs' copyrights.

## CONCLUSION

This Court should affirm the judgment of the district court.  In the alternative, if this Court vacates the judgment and remands this case to the district court for a new trial, it should clarify that taking affirmative steps to make a copyrighted work available for others to download online violates the exclusive right of distribution.

Dated: December 1, 2023

Respectfully submitted,

/s/ Andrew H. Bart
Andrew H. Bart
Jacob L. Tracer
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1645
abart@jenner.com

Paige Arnette Amstutz
SCOTT, DOUGLASS &
MCCONNICO, LLP
303 Colorado Street
Suite 2400
Austin, TX 78701
(512) 495-6300
pamstutz@scottdoug.com

Ian Heath Gershengorn
JENNER & BLOCK LLP
1099 New York Avenue NW,
Suite 900
Washington, DC 20001
(202) 639-6000
igershengorn@jenner.com

# CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2023, I caused the **Response and Principal Brief of Plaintiffs-Appellees/Cross-Appellants** to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that service on opposing counsel listed below will be accomplished by the CM/ECF system.

Richard L. Brophy
Zachary C. Howenstine
Armstrong Teasdale, LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
(314) 621-5070
rbrophy@atllp.com
zhowenstine@atllp.com

Dana Livingston
Cokinos Young, P.C.
900 South Capital of Texas Hwy.
Suite 425
Austin, TX 78746
(512) 482-9304
dlivingston@cokinoslaw.com

/s/ Andrew H. Bart
Andrew H. Bart

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 14,776 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365, in 14 point Century Schoolbook for the main text and 12 point Century Schoolbook for the footnotes, as permitted by 5th Cir. R. 32.1.

/s/ Andrew H. Bart
Andrew H. Bart