No. 23-50162

------

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

------

UMG RECORDINGS, INC.; CAPITOL RECORDS, L.L.C.; WARNER
BROS. RECORDS, INC.; SONY MUSIC ENTERTAINMENT; ARISTA
RECORDS, L.L.C.; ARISTA MUSIC; ATLANTIC RECORDING
CORPORATION; CAPITOL CHRISTIAN MUSIC GROUP, INC.;
ELEKTRA ENTERTAINMENT GROUP, INC.; FONOVISA, INC.;
FUELED BY RAMEN, L.L.C.; LAFACE RECORDS, L.L.C.;
NONESUCH RECORDS, INC.; RHINO ENTERTAINMENT
COMPANY; ROADRUNNER RECORDS, INC.; ROC-A-FELLA
RECORDS, L.L.C.; TOOTH & NAIL, L.L.C.; ZOMBA RECORDING,
L.L.C.,

*Plaintiffs-Appellees/Cross-Appellants*,

*v.*

GRANDE COMMUNICATIONS NETWORKS, L.L.C.,

*Defendant-Appellant/Cross-Appellee.*

------

On Appeal from the United States District Court
for the Western District of Texas (Austin)
No. 1:17-cv-000365-DAE

------

## PLAINTIFFS-APPELLEES/CROSS-APPELLANTS' PETITION
## FOR REHEARING *EN BANC*

------

**[caption continued on next page]**

Paige Arnette Amstutz
SCOTT, DOUGLASS &
MCCONNICO LLP
303 Colorado Street
Suite 2400
Austin, TX 78701
(512) 495-6300
pamstutz@scottdoug.com

Andrew H. Bart
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600
abart@jenner.com

Ian Heath Gershengorn
JENNER & BLOCK LLP
1099 New York Avenue NW,
Suite 900
Washington, DC 20001
(202) 639-6000
igershengorn@jenner.com

*Counsel for Plaintiffs-Appellees/Cross-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

No. 23-50162, *UMG Recordings, Inc., et al. v. Grande Communications Networks, L.L.C.*

Undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may exercise possible disqualification or recusal.

1) Plaintiffs-Appellees/Cross-Appellants: UMG Recordings, Inc., Capital Records, L.L.C., Warner Bros. Records Inc., Sony Music Entertainment, Arista Records, L.L.C., Arista Music, Atlantic Recording Corporation, Capital Christian Music Group, Inc., Elektra Entertainment Group, Inc., Fonovisa, Inc., Fueled by Ramen L.L.C., LaFace Records, L.L.C., Nonesuch Records Inc., Rhino Entertainment Company, Roadrunner Records, Inc., Roc-A-Fella Records, L.L.C., Tooth & Nail, L.L.C., Zomba Recording, L.L.C.

2) Plaintiffs-Appellees/Cross-Appellants Trial and Appellate Counsel: Andrew H. Bart, Jacob L. Tracer (motion to withdraw granted on 12/26/23) (Jenner & Block LLP); Michael Anthony Petrino (Stein

i

Mitchell Beato & Missner, LLP); Paige Arnette Amstutz (Scott, Douglass & McConnico LLP).

3)     Plaintiffs-Appellees/Cross-Appellants Additional Appellate Counsel: Ian Heath Gershengorn (Jenner & Block LLP).

4)     Plaintiffs-Appellees/Cross-Appellants Additional Trial Counsel: Kevin Attridge, Robert B. Gilmore, Philip O'Beirne (Stein Mitchell Beato & Missner LLP).

5)     Defendant-Appellant/Cross-Appellee: Grande Communications Networks, L.L.C.

6)     Defendant-Appellant/Cross-Appellee Trial and Appellate Counsel: Richard L. Brophy, Zachary C. Howenstine, Mark A. Thomas (Armstrong Teasdale, LLP).

7)     Defendant-Appellant/Cross-Appellee Appellate Counsel: Dana Livingston (Cokinos Young, P.C.).

8)     Defendant-Appellant/Cross-Appellee Additional Trial Counsel: Abigail Twenter, Edward F. Behm, Jr., Margaret R. Szewczyk, Sydney K. Johnson (Armstrong Teasdale, LLP); Diana L. Nichols, J. Stephen Ravel (deceased), John R. Johnson (Kelly Hart & Hallman LLP);

Jennifer E. Hoekel (Husch Blackwell); Nicholas B. Clifford (Tucker Ellis LLP).

Dated: November 6, 2024

/s/ Andrew H. Bart

Andrew H. Bart
*Attorney of Record for Plaintiffs-Appellees/Cross-Appellants*

## RULE 35(b) STATEMENT

This petition addresses an issue of statutory interpretation that has the potential to prevent copyright owners from obtaining proper compensation when their valuable intellectual property rights are infringed.  Section 504(c) of the Copyright Act allows a copyright owner to collect, in lieu of actual damages and profits, an award of statutory damages.  *See* 17 U.S.C. § 504(c).  Statutory damages serve an important purpose in the copyright system by deterring infringement and ensuring that copyright owners are fairly compensated when actual damages may be difficult to measure.

At issue here is how many statutory damages awards Plaintiffs-Appellees/Cross-Appellants ("Plaintiffs") are entitled to collect as compensation for Defendant-Appellant/Cross-Appellee Grande Communications Networks, LLC's ("Grande") adjudicated willful copyright infringement of Plaintiffs' sound recordings.  Section 504(c) authorizes copyright owners to obtain one statutory damages award for all infringements "with respect to any one work."  17 U.S.C. § 504(c)(1).  However, Congress did not define the term "work."  All six other United States Courts of Appeals that have addressed the issue have held that

iv

Section 504(c)(1) authorizes a separate statutory damages award for each infringed copyrightable unit of expression that was individually commercialized by its copyright owner—here, each recording of a separate song.  But the panel expressly rejected the consensus approach and instead held that when multiple individual works, in this case sound recordings, are *also* available in the marketplace as parts of a single compilation, as on a music album, the copyright owner may recover only *one* statutory damages award for all of the individual works included in the compilation, not separate awards for each work.  Because the panel's resolution of this issue "conflicts with the authoritative decisions of other United States Courts of Appeals," it involves a "question of exceptional importance."  Fed. R. App. P. 35(b)(1)(B).  This Court should rehear this case *en banc* to correct the panel's erroneous interpretation of Section 504(c)(1).

The panel grounded its decision in the last sentence of Section 504(c)(1), which instructs that "[f]or the purposes of this subsection, all the parts of a compilation or derivative work constitute one work."  17 U.S.C. § 504(c)(1).  In copyright law, a "compilation" is a collection of preexisting materials that are "selected, coordinated, or arranged in such

a way that the resulting work as a whole constitutes an original work of authorship." *Id.* § 101. Thus, the last sentence of Section 504(c)(1) serves to prevent a plaintiff from alleging and proving infringement of the original authorship in a *compilation* (*e.g.*, the particular selection, coordination, or arrangement of preexisting materials) and later arguing that it should be entitled to collect separate statutory damages awards for each of the compilation's constituent parts. That rule should have no bearing on this case, where Plaintiffs alleged and proved the infringement of individual sound recordings, not compilations.

However, the panel expansively interpreted the last sentence of Section 504(c)(1) to prevent the owners of copyrights in distinct stand-alone works from collecting individual statutory damages awards for infringement of those works merely because those works have *also* been commercialized as parts of compilations. In other words, the panel inverted the meaning of the last sentence of Section 504(c)(1) and turned a rule designed to ensure that compilation copyright owners do not obtain statutory damages windfalls into a rule that prevents copyright owners of individual works from obtaining just compensation.

The practical implications of the panel's rule are stark. For example, if an infringer separately downloads the recordings of four individual songs that so happened at any point in time to have been separately selected for and included among the ten tracks on a particular album, the panel's decision would permit the copyright owner to collect only one award of statutory damages for the four recordings collectively. That would be so even if there were unrebutted trial evidence that the four recordings were commercialized individually by the copyright owner. This outcome is wholly unsupported by the text of the Copyright Act.

Plaintiffs' request is narrow: The Court need not revisit the panel's decision as to liability, which correctly applied longstanding principles of secondary liability, in line with other circuit court authority, to affirm the jury's finding of willful contributory infringement. Rehearing *en banc* is warranted, however, to bring this Court into step with its sibling circuits on the interpretation of Section 504(c)(1).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

RULE 35(b) STATEMENT .........................................................iv

TABLE OF AUTHORITIES ....................................................ix

ISSUE PRESENTED ................................................................ 1

STATEMENT OF THE CASE AND PROCEEDINGS ........................... 1

ARGUMENT .......................................................................... 4

I.  The Panel's Interpretation Of Section 504(c)(1) Is Inconsistent
    With The Statutory Text And The Decisions Of Every Other
    Circuit Court To Interpret It ............................................ 4

II. The Panel's Decision Threatens Copyright Owners' Ability To
    Obtain Fair Damages .....................................................15

CONCLUSION ...................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown v. Ames,*
  201 F.3d 654 (5th Cir. 2000) ................................................................ 11

*Bryant v. Media Right Productions, Inc.,*
  603 F.3d 135 (2d Cir. 2010) .................................................................. 9

*Cullum v. Diamond A. Hunting, Inc.,*
  484 F. App'x 1000 (5th Cir. 2012) ........................................................ 10

*EMI Christian Music Grp., Inc. v. MP3Tunes, LLC,*
  844 F.3d 79 (2d Cir. 2016) ............................................................. 6, 8, 9

*Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors,*
*L.P.,*
  948 F.3d 261 (5th Cir. 2020) ................................................................ 16

*Gamma Audio & Video, Inc. v. Ean-Chea,*
  11 F.3d 1106 (1st Cir. 1993) ...................................................... 5, 7, 8, 14

*MCA Television Ltd. v. Feltner,*
  89 F.3d 766 (11th Cir. 1996) ........................................................... 5, 7, 8

*Sullivan v. Flora, Inc.,*
  936 F.3d 562 (7th Cir. 2019) ............................................. 5, 6, 7, 10, 12

*VHT, Inc. v. Zillow Grp., Inc.,*
  918 F.3d 723 (9th Cir. 2019) ........................................................... 5, 6, 7

*VHT, Inc. v. Zillow Grp., Inc.,*
  69 F.4th 983 (9th Cir. 2023) ......................................................... 6, 8, 12

*Walt Disney Co. v. Powell,*
  897 F.2d 565 (D.C. Cir. 1990) ......................................................... 5, 6, 7

*Xoom, Inc. v. Imageline, Inc.,*
  323 F.3d 279 (4th Cir. 2003) ............................................................ 9, 10

*Yellow Pages Photos, Inc. v. Ziplocal, LP,*
  795 F.3d 1255 (11th Cir. 2015) ............................................................. 14

## Statutes and Rules

17 U.S.C. § 410(c) ............................................................................... 14

17 U.S.C. § 504(c)(1) ....................................................................... 1, 4

37 C.F.R. § 202.4 ................................................................................ 14

Fed. R. App. P. 35(b)(1)(B) ............................................................... 15

## ISSUE PRESENTED

The Copyright Act permits copyright owners to recover one statutory damages award "for all infringements involved in the action, with respect to any one work," provided that "[f]or the purposes of this subsection, all the parts of a compilation or derivative work constitute one work." 17 U.S.C. § 504(c)(1). Do individual sound recordings that were indisputably commercialized and distributed to the public as individual works lose their status as separate "works" within the meaning of Section 504(c)(1) because those sound recordings were also included in a "compilation" such as an album?

## STATEMENT OF THE CASE AND PROCEEDINGS

Plaintiffs are entities affiliated with the three major record companies in the United States: Universal Music Group ("Universal"), Sony Music Entertainment ("Sony"), and Warner Music Group ("Warner"). ROA.11593-94. Collectively, Plaintiffs own copyrights in or have exclusive rights to a large majority of the sound recordings commercially distributed in the United States. ROA.11594-95. Although many of Plaintiffs' works are included on albums, Plaintiffs commercialized and monetized virtually all the sound recordings at issue

in this litigation *as individual tracks*, including through major digital services like Spotify, Apple Music, and iTunes.    ROA.11657-58; ROA.12788-89; ROA.11619; ROA.12506; ROA.12548-49.

In April 2017, Plaintiffs sued Grande, an internet service provider ("ISP") that provides high-speed internet access in exchange for monthly fees, for secondary copyright infringement.    ROA.98-152.    Plaintiffs' claims centered on Grande's affirmative decision to continue providing internet services to subscribers it knew were using those services to repeatedly infringe Plaintiffs' copyrighted works.    ROA.98-152; ROA.12398-400.  The infringements at issue took place using BitTorrent, a peer-to-peer file-sharing network that enables internet users to copy and distribute digital files directly to each other while remaining anonymous to the outside world.  ROA.12796-801.  Only the ISPs that provide infringers with internet access possess the records necessary to identify the specific internet users engaged in BitTorrent-enabled infringement.  ROA.12802-04; ROA.12326-27.

After a three-week jury trial, the jury unanimously found Grande liable for willful contributory copyright infringement.    ROA.10005-06. Pursuant to Section 504(c) of the Copyright Act, the jury awarded

Plaintiffs $46,766,200 in statutory damages, or $33,333 for each of the 1,403 infringed sound recordings in the case. *See* ROA.10005-06. The district court twice rejected Grande's argument that statutory damages should be awarded on a per-album basis rather than a per-sound-recording basis: first, by adopting Plaintiffs' proposed jury instruction and rejecting Grande's, *see* ROA.13402-04; ROA.13437-38, and second, by denying Grande's post-trial motion on this issue, *see* ROA.10552-68; ROA.11015-55.

On appeal, the panel affirmed the jury's verdict on liability. Op. at 10-35. However, the panel vacated the jury's damages award and remanded for a new trial on damages. *Id*. at 35-42. The panel held that statutory damages must be awarded on a per-album basis, rather than by considering each infringed sound recording as its own distinct work even when it was individually commercialized. *Id*. The panel acknowledged that this issue was one of first impression for this Circuit and that its decision departed from the "majority approach" of this Court's sibling circuits. Op. at 39.

## ARGUMENT

### I. The Panel's Interpretation Of Section 504(c)(1) Is Inconsistent With The Statutory Text And The Decisions Of Every Other Circuit Court To Interpret It.

The issue requiring *en banc* review is narrow and involves the interplay between two sentences of Section 504(c)(1) of the Copyright Act, which governs awards of statutory damages. Section 504(c)(1) permits copyright owners to recover one statutory damages award within a specified range "for all infringements involved in the action, with respect to any one work." 17 U.S.C. § 504(c)(1). It further states that, for statutory damages purposes, "all the parts of a compilation . . . constitute one work." *Id.*

It is undisputed that, at the time Plaintiffs' rights were infringed, Plaintiffs commercialized all but four of the 1,403 sound recordings at issue individually, and not solely as parts of compilations. ROA.11657-58; ROA.12788; ROA.12548-49. Grande presented no evidence to the contrary. *See* ROA.11657-58; ROA.12788; ROA.12548-49. Consistent with the industry-wide shift away from an ownership model of commercialization (where record companies largely sold physical copies of albums) to a business model focused primarily on providing access to

4

digital copies of individual recordings, Plaintiffs made their sound recordings available on an individual basis through digital music services, including Spotify, Apple Music, and iTunes. *See supra* at 1-2. However, some of those 1,403 sound recordings were also published as parts of the same album as other infringed recordings.[1] For those sound recordings, this case thus raises the question of whether they are ineligible for treatment as individual "work[s]" pursuant to Section 504(c)(1) merely because they were also available as "parts of a compilation."

Prior to the panel's decision in this case, ***six*** circuit courts held that if a work was commercialized individually at the time of infringement, it was eligible for an individual statutory damages award, even if that work was also made available as part of a compilation. *Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1116-17 (1st Cir. 1993); *Sullivan v. Flora, Inc.*, 936 F.3d 562, 567 (7th Cir. 2019); *VHT, Inc. v. Zillow Grp., Inc. ("VHT I")*, 918 F.3d 723, 747-48 (9th Cir. 2019); *MCA Television Ltd. v. Feltner*, 89 F.3d 766, 769-70 (11th Cir. 1996); *Walt Disney Co. v. Powell*,

---

[1] As the panel noted, *see* Op. at 42, Grande never even attempted to determine how many albums (rather than sound recordings) might be at issue in this litigation until after trial.

897 F.2d 565, 569-60 (D.C. Cir. 1990); *EMI Christian Music Grp., Inc. v. MP3Tunes, LLC*, 844 F.3d 79, 95 (2d Cir. 2016).

Critically, no circuit court had reached the opposite conclusion and read Section 504(c)(1) to mean that a work's inclusion in a compilation *negates* its potential existence as a separate, independent work. *See, e.g.*, *VHT, Inc. v. Zillow Grp., Inc. ("VHT II")*, 69 F.4th 983, 990 (9th Cir. 2023) (stating that Copyright Act "does not say that any work included in a compilation cannot also exist as a separate, independent work" (quotation omitted)). These courts have held that, as long as the material infringed qualifies as a "work," it can support a separate statutory damages award even if it was also available in the marketplace on the same compilation as other works.

Those holdings are consistent with the plain text of the statute. While Section 504(c)(1) directs courts to award statutory damages on a per-"work" basis, it does not define what a "work" is. *See Sullivan*, 936 F.3d at 567 (stating that "work" is a "term Congress left undefined in the Copyright Act"); *VHT I*, 918 F.3d at 747. To fill this definitional gap, courts have determined that a "work" is a unit of original copyrightable expression that is capable of living its "own copyright life" in the

6

marketplace. *Gamma Audio*, 11 F.3d at 1116 (quotation omitted); *Walt Disney Co.*, 897 F.2d at 569. Specifically, the First, Seventh, Ninth, Eleventh, and D.C. Circuits ask whether the unit of expression at issue has "independent economic value" to the copyright owner. *Gamma Audio*, 11 F.3d at 1116-17; *Sullivan*, 936 F.3d at 567; *VHT I*, 918 F.3d at 747-48; *MCA Television*, 89 F.3d at 769-70; *Walt Disney Co.*, 897 F.2d at 569-70. If it does, then the copyright owner is entitled to statutory damages as compensation for the infringement of each unit of copyrightable expression. But if the individual unit infringed has no independent economic value and derives its value only from being part of a larger collection of units, then the copyright owner can collect only one statutory damages award for the infringement of the collection as a whole.

For example, in *Gamma Audio*, the First Circuit held that each of the four television series episodes infringed by the defendant was its own "work" eligible for a separate statutory damages award. 11 F.3d at 1115-18. This was because each episode was "separately produced" and "aired on television independently from the preceding and subsequent episodes." *Id.* The court found it irrelevant that the episodes were all "registered on a single registration form," *id.* at 1116, or that the episodes were sold

as part of a compilation, given that the copyright owner sold or rented only complete sets of the series to video stores, *id*. at 1117. *See also MCA Television*, 89 F.3d at 768-70 (holding that each infringed television episode was entitled to separate statutory damages award).

Similarly, in *VHT II*, the Ninth Circuit held that each individual photograph from a real estate listing contained in the plaintiff's database was eligible for a separate statutory damages award, rejecting the argument that the plaintiff could recover only a single award for the entire database. 69 F.4th at 990. This was because "the individual photos were created at the request of a listing agent or broker, then licensed and published to that agent or broker for marketing an individual listing," and thus, "value came from each photo's individual content rather than their assembly within the database." *Id.*

The Second Circuit embraces a variation of the independent economic value test. In *EMI Christian Music Group, Inc. v. MP3Tunes, LLC*, that court recognized that "when a copyright holder or publisher issues material on an independent basis, the law permits a statutory damages award for each individual work." 844 F.3d at 101. It held that, when trial evidence demonstrated that individual sound recordings on an

8

album had been commercialized individually on the date of infringement, the plaintiffs could collect individual statutory damages awards even though the recordings were also commercially available (and registered) as parts of a single album. *Id.* Thus, the Second Circuit focused on how the copyright owner actually makes the work available and derives economic value from it.[2]

Finally, while the Fourth Circuit has not expressly interpreted the meaning of "work" within Section 504(c)(1), it indicated its support for the independent economic value test in *Xoom, Inc. v. Imagineline, Inc.*, 323 F.3d 279 (4th Cir. 2003). There, the works in suit were two clip-art bundles consisting of thousands of clip-art images. *Id.* at 281-82. The court properly held that, because the images were only commercialized in the form of the two collections, rather than as thousands of individual images, the plaintiffs could recover only two statutory damages awards.

---

[2] Contrary to the panel's assessment, the Second Circuit's earlier decision in *Bryant v. Media Right Productions, Inc.*, 603 F.3d 135 (2d Cir. 2010), does not require statutory damages on a per-compilation basis in all scenarios. There, the court affirmed an award of damages on a per-album basis because the copyright owner sold the infringed tracks *only* as part of albums. *Id.* at 140-42. As the Second Circuit stated, "infringement *of an album* should result in only one statutory damage award." *Id.* (emphasis added). Thus, the court correctly focused on how the copyright owner commercialized the particular work in the marketplace at the time it was infringed.

*Id.* at 285.[3]     However, the court went on to acknowledge that "the Copyright Act *does not bar* multiple awards for statutory damages when one registration includes multiple works." *Id.* (emphasis added).  As both the panel in this case and the Seventh Circuit in *Sullivan* noted, the *Xoom* court's qualification is substantial and suggests that the Fourth Circuit may follow the majority approach on different facts.  *See* 936 F.3d at 571.

In sum, before this case, every circuit court to consider the issue recognized that, under the plain text of the Copyright Act, a work's inclusion in a compilation does not bar it from existing as a separate, independent work within the meaning of Section 504(c)(1) when the work has been independently commercialized.  The panel, however, rejected that unanimous authority and held that individual sound recordings included on an album are not standalone works for statutory damages purposes, merely by virtue of their inclusion on an album.  *See* Op. at 35-42.

---

[3] In this Court's unpublished decision in *Cullum v. Diamond A. Hunting, Inc.*, likewise, the plaintiff could recover only one award where the infringed work was only commercially distributed as a collection of photographs available on a single compact disc.  484 F. App'x 1000, 1002 (5th Cir. 2012).

The panel reached this conclusion openly aware that it was parting ways with preexisting circuit court case law, recognizing that "the majority of the seven circuits to have considered this question apply a 'functional' test that looks to 'where the market assigns value.'" Op. at 37 (quotation omitted). Nevertheless, the panel rejected the grounded statutory analysis in those decisions to hold that works included in a compilation are categorically ineligible from receiving multiple statutory damages awards. The Fifth Circuit is the *only* circuit court in the nation to adopt this rule.

The panel's decision directly undermines national uniformity in assessing statutory damages under the Copyright Act. As this Court has recognized, one of the express objectives motivating the Copyright Act was to achieve such "national uniformity" in intellectual property law. *Brown v. Ames*, 201 F.3d 654, 660 (5th Cir. 2000). Having a radically different damages regime in one part of the country defeats this goal. Rehearing *en banc* is warranted to restore the uniformity Congress desired.

The panel's decision also misreads the statutory text. Contrary to the panel's assertion, the "plain language" of Section 504(c)(1) does not

"mandate[] the conclusion" that an independent work included in a compilation is categorically ineligible for a separate statutory damages award. *See* Op. at 36. The statute does not define "work." And, as the Ninth Circuit has expressly recognized, the Copyright Act "does not say that any work included in a compilation cannot also exist as a separate, independent work." *VHT II*, 69 F.4th at 990 (quotation omitted). Instead, Section 504(c)(1) draws a "distinction . . . between 'one work' and a 'compilation.'" *Sullivan*, 936 F.3d at 571 (quotation omitted). The key inquiry under the text of the statute is thus "whether the protected works have value only in and through their composite whole (and thus meet the definition of a 'compilation' in [17 U.S.C.] § 101) or instead have standalone value at the level of 'one work.'" *Id.* The "independent economic value" test adopted by other circuits addresses this statutorily mandated inquiry, while the panel's decision ignores it.

The panel determined that the last sentence of Section 504(c)(1) compelled its holding. But that sentence has relevance only when the alleged infringement is of the compilation itself (*e.g.*, the selection, coordination, and arrangement of the compilation). *See, e.g.*, *VHT II*, 69 F.4th at 989-90 (affirming damages award for independent works

notwithstanding their inclusion in a database where there were no allegations concerning "the aspects of [the] database that make it a compilation, *i.e.*, the selection, coordination, and arrangement of preexisting pictorial works").  By providing that "all the parts of a compilation . . . constitute one work," Section 504(c)(1) ensures that a plaintiff who alleges infringement of a *compilation* cannot receive a windfall by arguing that every component of the compilation is eligible for a separate award even though the components have no standalone marketplace value.  But where, as here, Plaintiffs allege infringement of works that have standalone marketplace value, the concern underlying the last sentence of Section 504(c)(1) is not present.  Thus, the panel's rule serves no purpose other than to punish copyright owners for their decision to include their standalone works on compilations in addition to commercializing them individually.

Compounding these errors, the panel's unprecedented rule, if left undisturbed, would create more confusion in the lower courts as they try to apply it to a variety of circumstances.  For example, record companies commonly release one or more singles from an album weeks or even months before the album itself is released.  Does the subsequent release

of the album retroactively nullify a single's status as an independent "work" under Section 504(c)?  Or, what if a sound recording is initially released only as a single but then included on a greatest hits album many years later?  The panel's rule raises more questions than it answers.

Further, although the panel's decision is unclear on this point, to the extent it purported to give dispositive weight to the works' registration certificates, *see* Op. at 39-40, this cannot be squared with the language of the Copyright Act or the preexisting authority on this issue. The statute instructs that a timely registration is simply "prima facie evidence" of the facts stated therein.  17 U.S.C. § 410(c).  Consistent with this language, several circuit courts have refused to consider copyright registrations as the relevant "unit of reference for determining the number of awards of statutory damages." *Gamma Audio*, 11 F.3d at 1117 & n.8; *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1277 (11th Cir. 2015) ("[T]he manner of copyright registration is not dispositive of the works issue . . . .").  Indeed, the Copyright Office specifically allows registration of multiple "works" on one registration. *See* 37 C.F.R. § 202.4.

14

Rehearing *en banc* is thus warranted to correct the panel's erroneous interpretation of Section 504(c)(1) and restore uniformity to federal circuit courts' decisions on this issue. *See* Fed. R. App. P. 35(b)(1)(B).

## II. The Panel's Decision Threatens Copyright Owners' Ability To Obtain Fair Damages.

Today, sound recordings are primarily commercialized (and generate revenue for copyright owners) as individual tracks, not as parts of albums. As early as 2000, the Copyright Office acknowledged the trend away from album sales and toward commercialization of individual sound recordings. *See Amicus Curiae* Brief for Copyright Alliance, Dkt. 77-1, at 22 (citing *Sound Recordings as Works Made for Hire before the Subcommittee on Courts and Intellectual Property Committee on the Judiciary, 106th Congress*, 2nd Session (May 25, 2000) (statement of Marybeth Peters, Register of Copyrights)). In the digital era, streaming is the primary source of revenue and necessarily involves the commercialization of individual recordings. At the same time, the internet has made pirated copies of sound recordings available at the click of a button. The panel's decision deprives copyright owners of the ability to be fairly compensated for massive infringement occurring

15

online merely due to the continued existence of an alternative form of commercial distribution, divorcing the damages calculation from both the reality of how copyright owners commercialize their works and how infringers unlawfully consume them.

Indeed, there is a certain irony to the panel's decision. Statutory damages "are intended not only to compensate copyright owners but also to deter copyright infringers." *Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, L.P.*, 948 F.3d 261, 274 (5th Cir. 2020). Yet the kind of rampant peer-to-peer infringement at issue in this case was a primary reason that record companies had to shift their business models from selling physical copies of compilations (albums) to making digital copies of recordings available on an individual basis (streaming/downloading). Thus, the panel's decision calculates statutory damages awards based on the remnants of a business model that digital piracy severely diminished.

In sum, the panel's resolution of the statutory damages issue involves a question of exceptional importance, because it will significantly impede copyright owners' ability to combat rampant online piracy. Rehearing *en banc* is warranted.

16

# CONCLUSION

Rehearing *en banc* should be granted solely as to the panel's decision interpreting 17 U.S.C. § 504(c)(1).

Dated: November 6, 2024                    Respectfully submitted,

/s/ Andrew H. Bart

Paige Arnette Amstutz                      Andrew H. Bart
SCOTT, DOUGLASS &                          JENNER & BLOCK LLP
MCCONNICO LLP                              1155 Avenue of the Americas
303 Colorado Street                        New York, NY 10036
Suite 2400                                 (212) 891-1600
Austin, TX 78701                           abart@jenner.com
(512) 495-6300
pamstutz@scottdoug.com                     Ian Heath Gershengorn
                                           JENNER & BLOCK LLP
                                           1099 New York Avenue NW
                                           Suite 900
                                           Washington, DC 20001
                                           (202) 639-6000
                                           igershengorn@jenner.com

# CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2024, I caused **Plaintiffs-Appellees/Cross-Appellants' Petition for Rehearing *En Banc*** to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that service on opposing counsel listed below will be accomplished by the CM/ECF system.

Richard L. Brophy
Zachary C. Howenstine
Armstrong Teasdale, LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
(314) 621-5070
rbrophy@atllp.com
zhowenstine@atllp.com

Dana Livingston
Cokinos Young, P.C.
900 S. Capital of Texas, Hwy.,
Suite 425
Austin, TX 78746
(512) 482-9304
dlivingston@cokinoslaw.com

/s/ Andrew H. Bart
Andrew H. Bart

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Fed. R. App. P. 35(b)(2)(A) and Fifth Cir. R. 35.5 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,894 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365, in 14-point Century Schoolbook for the main text and 12-point Century Schoolbook for the footnotes, as permitted by Fifth Cir. R. 32.1.

/s/ Andrew H. Bart
Andrew H. Bart

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 9, 2024

Lyle W. Cayce
Clerk

_____

No. 23-50162

_____

UMG Recordings, Incorporated; Capitol Records,
L.L.C.; Warner Bros. Records, Incorporated; Sony
Music Entertainment; Arista Records, L.L.C.; Arista
Music; Atlantic Recording Corporation; Capitol
Christian Music Group, Incorporated; Elektra
Entertainment Group, Incorporated; Fonovisa,
Incorporated; Fueled by Ramen, L.L.C.; LaFace Records,
L.L.C.; Nonesuch Records, Incorporated; Rhino
Entertainment Company; Roadrunner Records,
Incorporated; Roc-A-Fella Records, L.L.C.; Tooth &
Nail, L.L.C.; Zomba Recording, L.L.C.,

*Plaintiffs—Appellees/Cross-Appellants*,

*versus*

Grande Communications Networks, L.L.C.,

*Defendant—Appellant/Cross-Appellee*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:17-CV-365

_____

Before Higginbotham, Stewart, and Higginson, *Circuit Judges*.

Stephen A. Higginson, *Circuit Judge*:

No. 23-50162

This appeal arises from an action filed by Plaintiffs-Appellees/Cross-Appellants, a group of major record labels (collectively "Plaintiffs"), against Defendant-Appellant/Cross-Appellee Grande Communications Networks, LLC ("Grande"), a large internet service provider ("ISP") in Texas, for contributory copyright infringement. Judgment was entered below in Plaintiffs' favor following a three-week jury trial, in which ten jurors unanimously found Grande liable for willful contributory copyright infringement. The jury awarded Plaintiffs $46,766,200 in statutory damages pursuant to the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* ("the Copyright Act"). During trial, Grande moved orally for judgment as a matter of law ("JMOL") on the issue of its liability, which the district court denied. Grande renewed its motion for JMOL and, alternatively, a new trial on the issue of statutory damages, which the court again denied.

On appeal, Grande challenges the district court's rulings reflected in (1) the order denying Grande's renewed motion for JMOL or a new trial, including its reference back to legal questions previously resolved at summary judgment; (2) the jury instructions; and (3) the final judgment. Plaintiffs' conditional cross-appeal challenges one ruling made by the district court in its jury instructions.

We hold that the district court did not err in concluding the jury's verdict finding Grande liable for contributory copyright infringement was supported both as a matter of law and by sufficient evidence, so we do not reach Plaintiffs' conditional cross-appeal. However, the district court erred in granting JMOL that each of the 1,403 songs in suit was eligible for a separate award of statutory damages. Accordingly, we AFFIRM the jury's verdict finding Grande liable for contributory copyright infringement; VACATE the jury's damages award and REMAND for a new trial on damages; and DISMISS Plaintiffs' conditional cross-appeal as moot.

No. 23-50162

## I.

## A.

This appeal follows a judgment entered in Plaintiffs' favor following a three-week jury trial. After hearing all the evidence, ten jurors unanimously found Grande liable for willful contributory copyright infringement. The jury awarded Plaintiffs $46,766,200 in statutory damages pursuant to the Copyright Act. That award was based on Plaintiffs' presentation of the facts below, which we must "credit" just as the jury did. *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (citation omitted).

## 1.

Peer-to-peer ("P2P") file-sharing networks have existed for decades and enable internet users to copy and distribute digital files directly to each other. Notable examples over the years include Napster, Grokster, KaZaA, and LimeWire. P2P networks have been used to facilitate the unauthorized distribution of copies of copyrighted works. Each of the P2P networks mentioned above was sued by copyright owners for secondary copyright infringement, adjudicated to be liable, and shut down as a result.

P2P networks have evolved over time, making them increasingly difficult for copyright owners to police. Plaintiffs argued at trial that the P2P network BitTorrent substantially limits the ability of copyright owners to protect their rights in two important ways. First, BitTorrent is decentralized, meaning that no single company or entity manages the distribution of its software. Thus, there is no "BitTorrent" entity that can be sued like Napster or Grokster were. Second, BitTorrent is "anonymous," meaning that its users cannot be identified by their names or physical addresses. Rather, BitTorrent identifies users only by their "IP addresses," which are unique strings of characters identifying particular devices connected to networks run

No. 23-50162

by various ISPs. Only the ISPs operating those networks possess the records necessary to match specific IP addresses to specific internet users.

To crack down on copyright infringement, third-party companies have developed technologies to infiltrate BitTorrent and identify infringing users by their IP addresses. One such company is Rightscorp, Inc. ("Rightscorp"). Rightscorp's proprietary technology:

- Interacts with BitTorrent users and obtains their agreement to distribute unauthorized copies of copyrighted works
- Records the relevant available details of that agreement, such as the user's IP address and what the infringed content is
- Cross-references the user's IP address against publicly available databases to identify which ISP is affiliated with that IP address
- Generates and sends infringement notices to the relevant ISPs so that they can identify their infringing subscribers and take appropriate action; and
- Frequently reconnects with the identified infringing IP addresses and downloads copies of the copyrighted works at issue directly from those users

In other words, Rightscorp identifies infringing conduct on BitTorrent by engaging with BitTorrent users, documents that conduct, and uses the information available to it to notify ISPs of its findings so that the ISP can take appropriate action.[1]

---

[1] Grande disputes Plaintiffs' characterization of Rightscorp as innocuously seeking to help ISPs reduce infringement by their subscribers, pointing to Rightscorp's profit motive as driving the high volume of notices it sent to Grande.

**2.**

The efficacy of Rightscorp's technology is dependent on the participation of the ISP.  Only the ISPs possess the records necessary to match specific IP addresses to specific individual subscribers.  Thus, when Rightscorp sends its notices to ISPs informing them of the IP addresses of their subscribers engaging in specific infringing conduct, the ISPs are the only parties capable of identifying the infringing subscribers and addressing their misconduct.

Because ISP involvement is critical to stemming the tide of copyright infringement, copyright law incentivizes ISPs to participate in addressing the conduct of their infringing subscribers.  Specifically, 17 U.S.C. § 512, enacted as part of the Digital Millennium Copyright Act ("DMCA"), gives ISPs a complete defense (a "safe harbor") to claims seeking damages for copyright infringement based on the activities of their users.  That safe-harbor defense is available to ISPs only if they meet certain threshold requirements, including that they have "adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers . . . who are repeat infringers."  17 U.S.C. § 512(i)(1)(A).  However, § 512 also provides that an ISP's failure to qualify for the safe harbor "shall not bear adversely upon the consideration of a defense by the [ISP] that [its] conduct is not infringing under this title or any other defense." *Id.* § 512(*l*); *see BWP Media USA, Inc. v. T & S Software Assocs., Inc.*, 852 F.3d 436, 443-44 (5th Cir. 2017) (explaining that "the DMCA's safe harbor for ISPs is a floor, not a ceiling, of protection" (cleaned up)).  Section 512 thus balances the interests of copyright owners (who need the help of ISPs to stop mass infringements by subscribers of their networks) and ISPs (who are immunized from infringement claims seeking damages if they take steps to address their infringing subscribers).

**3.**

In the early 2000s, Grande began addressing copyright infringement by its subscribers through an "abuse process," which the company employed to address illicit activity conducted on its network. At that time, when Grande received an infringement notice about one of its subscribers, Grande disconnected that subscriber's service. Grande then informed the subscriber and applied "punitive measures" if the conduct continued. One of Grande's trial witnesses agreed that subsequent infringements by the same subscriber "led to account termination."[2]

However, in 2009, the private equity firm ABRY Partners purchased Grande and installed a different company to manage Grande's operations. In October 2010, that company changed Grande's policy. Under Grande's new policy, Grande no longer terminated subscribers for copyright infringement, no matter how many infringement notices Grande received. As Grande's corporate representative at trial admitted, Grande "could have received a thousand notices about a customer, and it would not have terminated that customer for copyright infringement." Further, under Grande's new policy, Grande did not take other remedial action to address infringing subscribers, such as suspending their accounts or requiring them to contact Grande to maintain their services. Instead, Grande would notify subscribers of copyright infringement complaints through letters that described the nature

_____

[2] At trial, Grande disputed whether account terminations occurred during this time period, and it maintains on appeal that the trial evidence showed that before 2010, it only "occasionally suspended" subscribers' service "on an ad hoc basis" in response to infringement notices. But Grande's corporate representative testified at his deposition that Grande "did terminate subscribers for copyright infringement" during this period. At trial, that witness testified that Grande did not "permanently terminate" subscribers' accounts during that period, but as Plaintiffs note, the jury was entitled to rely on his prior statement, as well as the similar trial testimony of a colleague.

of the complaint and possible causes and advised that any infringing conduct is unlawful and should cease. Grande maintained that policy for nearly seven years, until May 2017.

In 2011, Rightscorp began sending notices via email to Grande (and other ISPs), pursuant to an agreement it had with certain music publishing companies. Between 2011 and when Plaintiffs filed this lawsuit in April 2017, Rightscorp sent more than 1.3 million infringement notices to Grande, approximately 317,000 of which concerned works in this suit. Each notice documented a specific instance of a Grande subscriber agreeing to distribute a copy of a copyrighted work without authorization. These emails asked the ISP to forward the notice to the relevant subscriber and included a link for the subscriber to contact Rightscorp and settle the claim for a small sum (e.g., $30). Rightscorp also sent periodic "roll-up reports" to Grande, each of which summarized the infringement notices that Rightscorp had previously sent to Grande. The jury learned that in one year alone, Grande had been advised that more than forty of its subscribers had infringed over 1,000 times and that one subscriber had infringed nearly 14,000 times.

During the period when Grande was receiving Rightscorp's notices but had a policy not to terminate subscribers' accounts for copyright infringement, one of Grande's employees wrote an email to his colleagues explaining that Grande's policy had "no limits" and that some of Grande's subscribers were "up to their 54th notice" with "no process for remedy in place." That employee testified at trial that, in April 2013, he "was concerned" that Grande was not in compliance with the law. But Grande did not change its policy.

Nor did Grande change its policy after learning in December 2015 that a different ISP, Cox Communications ("Cox"), had been found liable for secondary copyright infringement based on its continued provision of

internet services to subscribers it knew were infringing based upon its receipt of Rightscorp's notices.  *See BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634 (E.D. Va. 2015), *aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018).

Shortly thereafter, Grande undertook an internal investigation to determine how many Rightscorp notices it had received over the years and had internal discussions about a letter Rightscorp sent to Grande a year earlier seeking a meeting to discuss how they could work collaboratively to address infringements by Grande's subscribers.  Yet Grande chose not to change its policy or meet with Rightscorp.  It was not until after Plaintiffs initiated this lawsuit that Grande resumed terminating subscribers for copyright infringement.

Grande's policy during the nearly seven years at issue in this case not to terminate subscribers for copyright infringement contrasted with its policy during the same time period regarding subscribers who did not pay Grande's monthly fees.  The trial record established that Grande consistently terminated the accounts of all subscribers who stopped paying Grande's fees during that period.  One of Grande's witnesses admitted that Grande terminated non-paying subscribers 100% of the time and that, during the time period relevant to this case, Grande terminated "thousands" of subscribers for nonpayment.

## B.

### 1.

In April 2017, Plaintiffs filed suit against Grande, alleging claims for both contributory and vicarious copyright infringement under the Copyright Act.  The district court dismissed the vicarious-infringement claim at the pleading stage and Plaintiffs do not dispute its dismissal on appeal.

After discovery, the parties cross-moved for summary judgment. Grande asserted that it qualified for the DMCA safe-harbor defense, but the district court held that Grande was not entitled to that defense as a matter of law. Grande does not dispute that ruling on appeal.

The district court otherwise denied the parties' cross-motions on liability, concluding that fact issues precluded the resolution of Plaintiffs' contributory-infringement claim as a matter of law. Accordingly, that claim went to trial.

**2.**

A jury of ten jurors was impaneled in Austin, Texas in October 2022. Trial was held from October 12, 2022, through November 1, 2022.

During trial, Grande moved orally for JMOL on the issue of its liability, which the district court denied. After deliberating for a day and a half, the jury returned a verdict, finding that Grande was liable for contributory copyright infringement of 1,403 of Plaintiffs' sound recordings. The jury also found that Grande's infringement was willful.[3] The jury awarded $46,766,200 total in statutory damages, or $33,333 per song. *See* 17 U.S.C. § 504(c)(1-2) (setting statutory damages at up to $30,000 per work, or up to $150,000 per work if the infringement was willful).

The district court entered a final judgment in January 2023. In February 2023, Grande renewed its motion for JMOL and, alternatively, a new trial. Grande filed a notice of appeal a few days later, and Plaintiffs filed their notice of conditional cross-appeal shortly thereafter. After the district

---

[3] Grande has abandoned any challenge to the jury's finding that its infringement was willful by failing to brief it. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021).

No. 23-50162

court denied Grande's post-judgment motion in May 2023, Grande amended its notice of appeal in June 2023 to add that ruling.

**3.**

Grande's appeal challenges the district court's rulings reflected in (1) the order denying Grande's renewed motion for JMOL or a new trial, including its reference back to legal questions previously resolved at summary judgment; (2) the jury instructions; and (3) the final judgment. Plaintiffs' cross-appeal, which is conditional on a determination that this case must be remanded to the district court for a new trial, challenges one ruling made by the district court in its jury instructions.

**II.**

We have jurisdiction over Grande's appeal from a final judgment under 28 U.S.C. § 1291. We also have jurisdiction over Plaintiffs' conditional cross-appeal, which is timely.[4] *See Art Midwest Inc. v. Atl. Ltd. P'ship XII*, 742 F.3d 206, 211 (5th Cir. 2014) (holding that "a party who prevails in the district court is permitted to conditionally raise issues in a cross-appeal" in furtherance of "the important value of procedural efficiency" (internal quotation marks and citations omitted)); Fed. R. App. P. 4(a)(3) (providing that "[i]f one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed").

---

[4] Although we have jurisdiction over Plaintiffs' cross-appeal, we do not reach it for the reasons explained *infra* n.15.

No. 23-50162

The district court's legal rulings are reviewed de novo.[5] *Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 384 (5th Cir. 2017).

"We review a district court's denial of a motion for judgment as a matter of law de novo, applying the same standards as the district court." *Id.* "Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P. 50(a)). When a party challenges the denial of a motion for JMOL following a jury trial, our review is "especially deferential" to the jury's verdict. *Olibas v. Barclay*, 838 F.3d 442, 448 (5th Cir. 2016) (citation omitted). We must "credit the non-moving party's evidence and disregard all evidence favorable to the moving party that the jury is not required to believe." *Abraham*, 708 F.3d at 620 (cleaned up). That is because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150 (citation omitted).

Our court has not decided the standard for reviewing what constitutes a "work" for statutory damages purposes, but other circuits treat it as a mixed question of fact and law subject to de novo review. *See, e.g.*, *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 739 (9th Cir. 2019); *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1277 (11th Cir. 2015); *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 140 (2d Cir. 2010). Where, as here, legal questions (such as statutory interpretation) predominate, we review mixed questions

---

[5] As the district court correctly observed, Grande preserved its challenges to the district court's legal conclusions.

of fact and law de novo. *See Beech v. Hercules Drilling Co.*, 691 F.3d 566, 569 (5th Cir. 2012).

"Jury instructions are reviewed for abuse of discretion." *Janvey*, 856 F.3d at 388. While the scope of review requires us to consider the charge as a whole, *Mid-Continent Cas. Co. v. Petroleum Sols., Inc.*, 917 F.3d 352, 357 (5th Cir. 2019), "[t]he abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions," *Koon v. United States*, 518 U.S. 81, 100 (1996). "A district court by definition abuses its discretion when it makes an error of law." *Id.* Thus, when a challenged jury instruction hinges on a question of law, review is de novo. *GE Cap. Com., Inc. v. Worthington Nat'l Bank*, 754 F.3d 297, 302 (5th Cir. 2014). However, an erroneous jury instruction is reversible only if it "affected the outcome of the case." *Mid-Continent*, 917 F.3d at 357 (citation omitted).

## III.

Pursuant to longstanding principles of secondary copyright liability, Plaintiffs' claim against Grande for contributory copyright infringement had four elements. In order to prove direct infringement by Grande's subscribers, Plaintiffs had to show (1) that Plaintiffs own or have exclusive control over valid copyrights and (2) that those copyrights were directly infringed by Grande's subscribers. *See BWP Media USA*, 852 F.3d at 439. To further prove that Grande was secondarily liable for its subscribers' conduct, Plaintiffs had to demonstrate (3) that Grande had knowledge of its subscribers' infringing activity and (4) that Grande induced, caused, or materially contributed to that activity. *See Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 790 (5th Cir. 1999). The district court did not err in upholding the jury's unanimous liability verdict because Plaintiffs satisfied each element legally and factually. The court correctly interpreted the law and instructed the jury on the relevant legal standards in light of the factual

issues disputed by the parties, and Plaintiffs introduced ample evidence from which a reasonable jury could find in Plaintiffs' favor. We discuss each of those four elements in turn.

## A.

To establish ownership, a "plaintiff must prove that the material is original, that it can be copyrighted, and that he has complied with statutory formalities." *Lakedreams v. Taylor*, 932 F.2d 1103, 1108 (5th Cir. 1991). The requisite statutory formalities are receipt of the application for registration, fee, and deposit by the copyright office. *Id.*

At summary judgment, Plaintiffs submitted declarations establishing the chains of title by which they came to own or exclusively control the copyrights in each work in suit. Grande did not dispute the validity of this evidence on the merits. Accordingly, the district court reasoned that Plaintiffs' unrebutted evidence was "sufficient to prove ownership" as a matter of law and did not include ownership as an issue of fact remaining to be resolved in the case.

The district court reaffirmed this ruling multiple times. In its ruling on the parties' motions *in limine* before trial, the district court confirmed that it had "already ruled on ownership" and held that "[o]wnership is not a remaining issue for trial." In its jury instructions, the district court instructed that the "issue [of ownership] has already been resolved, and you do not need to decide it." The district court also indicated at the jury-charge conference that there was "no question" that Plaintiffs own or control the works in suit. And when addressing Grande's oral motion for JMOL, the district court reaffirmed these prior rulings, determining that "there's not been one shred of evidence anywhere that . . . plaintiffs in this case don't own those copyrights."

No. 23-50162

Grande did not challenge any of these rulings on the merits below, nor does it challenge them on appeal. Rather, Grande complains about the process by which the district court ruled on this issue in its procedural-history section. Grande has therefore forfeited any argument that Plaintiffs failed to establish ownership over the works in suit, *see Smith v. Sch. Bd. of Concordia Par.*, 88 F.4th 588, 594-96 (5th Cir. 2023), and the district court properly concluded that Plaintiffs satisfied the first element.

**B.**

To prove the second element—that the defendant copied constituent elements of the plaintiff's work that are original—a plaintiff must establish "(1) factual copying and (2) substantial similarity." *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012) (citation omitted). Factual copying can be proven by either direct or circumstantial evidence. *Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir. 2007) (per curiam). Substantial similarity requires proof that "the copyrighted expressions in the two works are sufficiently alike that the copyright to the original work has been infringed." *Id.*

The district court instructed the jury that, to prove direct infringement, Plaintiffs needed to establish that each work in suit was "infringed by distributing any part of the copyrighted work without Plaintiffs' authorization." To find an unauthorized distribution, the jury could consider "direct or circumstantial evidence," including "evidence that copyrighted content was offered or distributed to a third party who is investigating or monitoring infringing activity."

Plaintiffs provided substantial evidence that Grande's subscribers committed direct infringement. For each work in suit, Plaintiffs introduced testimony and documentary evidence that (1) Rightscorp reached an agreement with a Grande subscriber to distribute the work; (2) Rightscorp

sent Grande a notice of infringement documenting that agreement; (3) Rightscorp re-approached Grande users who had previously agreed to distribute the work and obtained at least one (and usually more than one) complete copy of the work from those Grande subscribers;[6] (4) Plaintiffs' trade association, the Recording Industry Association of America, Inc. ("RIAA"), used an industry-standard software program called Audible Magic—which forensically analyzes the contents of digital audio files to determine if those files match the contents of files in a database that contains authorized authentic copies of Plaintiffs' sound recordings—to verify that Rightscorp in fact downloaded each work at issue;[7] and (5) each Plaintiff had an employee personally familiar with Plaintiffs' sound recordings listen to a

---

[6] The jury also heard testimony that data contained within the files Rightscorp downloaded from Grande's subscribers verified the accuracy of Rightscorp's notices. The processes by which Rightscorp generated notices and obtained downloads were both based on searching for the same underlying "hash value" by which the works in suit could be identified on BitTorrent. As one of Plaintiffs' experts, Barbara Frederiksen-Cross, explained: A "hash value" is a unique "long string of letters and numbers" that is "generated mathematically based on the contents" of a particular digital file. Frederiksen-Cross testified that the chances that two files with the same hash value are in fact two different files is so "infinitesimally small" that it is "one followed by 26 to 50 different zeros."

[7] An RIAA employee testified that over the course of his career, he has used Audible Magic "millions of times" to determine whether digital files downloaded from many different sources online are actual copies of Plaintiffs' sound recordings in Audible Magic's database. In all that use, Audible Magic never made a mistake in identifying the contents of a digital file. Indeed, one of Plaintiffs' experts offered unrebutted testimony that Audible Magic's error rate in identifying the contents of digital audio files is approximately one in three billion. And as the district court recognized, Plaintiffs' use of Audible Magic to confirm that the digital files at issue were copies of their copyrighted works is a well-established practice in large-scale copyright infringement cases such as this one. *See, e.g.*, *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1012 (9th Cir. 2013); *Capitol Recs., LLC v. Escape Media Grp., Inc.*, No. 12-CV-6646, 2015 WL 1402049, at *23 (S.D.N.Y. Mar. 25, 2015) (collecting cases); *UMG Recording, Inc. v. Escape Media Grp., Inc.*, No. 11 Civ. 8407, 2014 WL 5089743, at *17 (S.D.N.Y. Sept. 29, 2014) (collecting cases).

random sample of fifty Rightscorp downloads, and those employees testified that the files they listened to were in fact copies of the sound recordings that Audible Magic identified and were owned by their respective companies.

Grande's key defense at trial was that Plaintiffs' evidence of direct infringement was unreliable. On appeal, Grande does not challenge any of the evidence of direct infringement that Plaintiffs offered. Grande instead asserts that because Plaintiffs did not introduce the copyrighted songs at issue into evidence, the jury could not conduct a side-by-side comparison of the works, and thus could not find that the allegedly infringing works were substantially similar to the works owned by Plaintiffs.

To support its argument, Grande relies principally on this court's decisions in *Bridgmon v. Array Systems Corp.*, 325 F.3d 572 (5th Cir. 2003) and *King v. Ames*, 179 F.3d 370 (5th Cir. 1999).

*King* involved a copyright-infringement claim in which the plaintiff "failed to produce the copies of the sound recordings she deposited with the United States Copyright Office." *King ex rel. King v. Ames*, No. 3:95-CV-3180, 1997 WL 327019, at *5 (N.D. Tex. June 4, 1997). On appeal, this court explained that "[t]o determine whether an instance of copying is legally actionable, a side-by-side comparison must be made between the original and the copy to assess whether the two works are substantially similar." *King*, 179 F.3d at 376. Because "copying is an issue to be determined by comparison of works, not credibility," and the plaintiff failed "to adduce evidence for such a comparison," her claim was "vitiate[d]." *Id.*

This court applied *King* in *Bridgmon*. There, the plaintiff brought a copyright-infringement claim against a corporation for its use and sale of a computer program known as ICUS, which he alleged infringed his copyright in another computer program called ADS, of which he was the author. *Bridgmon*, 325 F.3d at 575. However, the plaintiff was "unable to produce a

copy of the ADS software; the only evidence of its content consisted of his oral testimony." *Id.* at 576. This court rejected the plaintiff's contention "that he need not produce evidence of substantial similarity between the copyrighted [ADS] software and the [ICUS] software . . . because there is evidence of direct copying." *Id.* at 577. That's because "the law of this circuit prohibits finding copyright infringement without a side-by-side comparison of the two works." *Id.* Therefore, the plaintiff's "failure to adduce evidence to allow a comparison between the ADS and the allegedly infringing program vitiate[d] his claim." *Id.*

It's true that *King* and *Bridgmon* contemplate "side-by-side comparison" of the works at issue. 179 F.3d. at 376; 325 F.3d at 577. But in those cases, the parties meaningfully disputed whether the defendants' alleged copies were substantially similar to the plaintiffs' alleged works, and the only evidence about the contents of the plaintiffs' works was the oral testimony of the plaintiffs themselves. *See King ex rel. King*, 1997 WL 327019, at *5-6; *Bridgmon*, 325 F.3d at 576. As a result, the plaintiffs could not satisfy their burdens to prove that the defendants' alleged copies were substantially similar to the plaintiffs' alleged works merely by asking the jury to credit the plaintiffs' oral testimony. *See King*, 179 F.3d at 375-76; *Bridgmon*, 325 F.3d at 576. Those circumstances differ markedly from the record here, where Plaintiffs introduced extensive, forensically reliable evidence proving that the files Rightscorp downloaded were exact copies of Plaintiffs' sound recordings. The jury was entitled to rely on the records generated by Audible Magic, which themselves evinced a "side-by-side comparison" between Plaintiffs' copyrighted sound recordings and Rightscorp's BitTorrent downloads, *see King*, 179 F.3d. at 376; *Bridgmon*, 325 F.3d at 577, as well as the unrebutted testimony offered by Plaintiffs that Audible Magic's error rate is approximately one in three billion. Particularly in light of evolving technology—and the side-by-side comparison now permitted by software

programs like Audible Magic in cases involving BitTorrent downloads identified by hash values—Grande's rigid reading of *King* and *Bridgmon* is inapposite. Accordingly, a new trial is not warranted on this ground.

## C.

As to the third element, the district court applied the correct legal standard and Plaintiffs presented sufficient evidence to show that Grande had knowledge of, or was willfully blind to, its subscribers' infringing activity.

Pursuant to the district court's jury instruction, Plaintiffs were required to demonstrate that Grande "knew of specific instances of infringement or was willfully blind to such instances of infringement," where willful blindness meant that Grande "believe[d] there [was] a high probability of a fact but deliberately [took] steps to avoid learning it."[8]

The district court also correctly concluded that the jury had a legally sufficient basis to find knowledge or willful blindness. Grande does not challenge the sufficiency of evidence supporting the jury's finding that Grande had knowledge of, or was willfully blind to, its subscribers' infringing activity. Grande has therefore abandoned any argument concerning the insufficiency of its knowledge or willful blindness. *See Rollins*, 8 F.4th at 397.

## D.

Grande's challenge to the district court's application of material-contribution liability—the fourth element—is the crux of its appellate challenge to the judgment below. Although Grande makes several strong arguments, they are ultimately unavailing for the reasons we explain.

---

[8] Grande does not challenge the district court's instruction concerning "willful blindness" on appeal and has therefore abandoned any argument against that instruction. *See Rollins*, 8 F.4th at 397.

**1.**

First, we conclude that the district court applied the correct legal standard by determining that Grande could be secondarily liable if it induced, caused, or materially contributed to its subscribers' infringing activity.

The district court explained at summary judgment and again post-judgment that "the purveyor of a technology capable of both infringing and non-infringing uses cannot hide behind the technology's non-infringing uses to shield itself from liability when the purveyor has induced, caused, or materially contributed to the infringer's activity."

Grande contends the district court's reasoning was erroneous because "[t]he Supreme Court has recognized two—and only two—types of contributory copyright infringement": (1) where "the defendant distribute[s] a product or service without any commercially significant, non-infringing use," and (2) where there is "clear expression or other affirmative steps taken to foster infringement" by the defendant. Plaintiffs respond that this court "has expressly embraced [the material-contribution] theory of liability" and the three Supreme Court opinions cited by Grande "did not write material contribution out of the law."

In 1999, our court recognized the validity of material-contribution claims for contributory copyright infringement. *See Alcatel*, 166 F.3d at 790. In doing so, we adopted the elements of the contributory-copyright claim from the Second Circuit's seminal decision in *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159 (2d Cir. 1971). *See id.* at 790 n.71. *Gershwin* recognized that contributory-infringement claims stem from "the common law doctrine that one who knowingly participates [in] or furthers a tortious act is jointly and severally liable with the prime tortfeasor." 443 F.2d at 1162 (citation omitted). The court in *Gershwin* synthesized that common-law principle into a rule that "one who, with

knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Id.*; *see Alcatel*, 166 F.3d at 790 & n.71.

Grande contends that material contribution is not a valid basis for contributory copyright liability, based on its reading of three United States Supreme Court opinions: *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), and *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). However, none of those decisions holds that knowingly providing material contribution to infringement is an inadequate basis for a finding of contributory copyright liability. *See United States v. Lipscomb*, 299 F.3d 303, 313 n.34 (5th Cir. 2002). We consider each case in turn.

**a.**

As an initial matter, in both *Sony* and *Grokster*, the Court expressly embraced the common-law standards for contributory infringement and acknowledged more generally that cases based on different factual circumstances would require different applications of those standards.

In *Sony*, the Court addressed the issue of when the manufacturer and distributor of a product (there, the Betamax video tape recorder) could be held secondarily liable for subsequent copyright infringements committed by users of that product. *See* 464 U.S. at 420. The question presented to the Court was whether selling a product that facilitated infringement, standing alone, was sufficient to impose contributory copyright liability. The Court held it was not, so long as the product was "capable of substantial noninfringing uses." *Id.* at 442. This mirrors the standard for contributory liability under patent law, which "is confined to the knowing sale of a component especially made for use in connection with a particular patent." *Id.* at 440.

The Court's analysis in *Sony* focused on the fact that the case involved the sale of a product, because in such a case, the defendant's contact with its customers ended at the "moment of sale" and the defendant did not know what its customers did with the product thereafter. *Id.* at 437-38. Accordingly, any liability had to be premised solely on the defendant's "constructive knowledge" of how its customers might use the product in the future. *Id.* at 439. *Sony* did not limit—or even address—the scope of contributory liability generally or criticize or limit the controlling principles derived from common law. To the contrary, the Court expressly contrasted the type of case before it (i.e., one involving the sale of a product) with one in which the defendant might have an "ongoing relationship" with its infringing customers beyond the moment of sale. *Id.* at 437; *see id.* at 437 n.18 (citing *Gershwin* as one such case involving an ongoing relationship). *Sony* therefore stands only for the narrow proposition that a defendant's mere sale of a product capable of infringement is not sufficient to establish the defendant's knowledge of its customers' future infringing activity when the product is also capable of non-infringing uses.

**b.**

Like *Sony*, *Grokster* dealt with a defendant that distributed a product which facilitated infringement—specifically, software that enabled users to share digital files through a P2P network.[9] *See* 545 U.S. at 919-20. Purporting to apply *Sony*, the Ninth Circuit had held that the defendant was entitled to summary judgment because the software was capable of non-infringing uses. *See id.* at 932-34.

---

[9] BitTorrent lacks a centralized corporate entity that could be sued as Grokster was. Even so, Grande has identified at least six actors that "play[] a direct role in the sharing of copyrighted music files over BitTorrent."

The Supreme Court reversed, holding that while *Sony* prohibited "imputing culpable intent" from the distribution of the product alone, it "did not displace other theories of secondary liability" or require courts to ignore other evidence of the defendant's intent. *Id.* at 934. Because the record in *Grokster* contained evidence that the defendant distributed the software "with the object of promoting its use to infringe copyright" (i.e., to "induce" its customers' infringements), summary judgment in the defendant's favor was not warranted. *Id.* at 936-37.

By holding that the distributor of a product that facilitates infringement can be liable when it induces future infringements after the moment of sale, *Grokster* expanded the doctrine of contributory infringement. Before *Grokster*, the distributor of a product could not be liable for future infringements so long as the product was capable of "substantial non-infringing uses." *Sony*, 464 U.S. at 442. But after *Grokster*, an inducement claim could succeed against the distributor of a product if the distributor affirmatively induced future infringements, even if the product was capable of substantial non-infringing uses. *See Grokster*, 545 U.S. at 936-37; *see also BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 306 (4th Cir. 2018) ("In fact, providing a product with 'substantial non-infringing uses' *can* constitute a material contribution to copyright infringement.").

Here, Grande provides its subscribers with internet services on a continuous basis in exchange for regular monthly subscription fees. Those actions create an "ongoing relationship" between Grande and its infringing subscribers that extends beyond a single moment of sale. *Sony*, 464 U.S. at 437. Accordingly, Plaintiffs' theory of liability in this case is not based on Grande's knowledge about its subscribers' likely future activities after the moment of sale, but rather on Grande's knowledge of its subscribers' actual infringements based on its ongoing relationship with those subscribers.

Because *Sony* and *Grokster* expressly addressed records where such a continuing relationship did not exist, their holdings do not foreclose the theory of liability on which Plaintiffs here based their claim. *See, e.g.*, *Sony Music Ent. v. Cox Commc'ns, Inc.*, 93 F.4th 222, 235-36 (4th Cir. 2024); *BMG*, 881 F.3d at 305-07.

It's true, as Grande points out, that *Grokster* omitted any mention of material contribution when it cited *Gershwin*, instead referring solely to liability based on "intentionally inducing or encouraging direct infringement." 545 U.S. at 930. However, nothing required the Court to list every possible basis for relief, rather than the grounds directly relevant to the dispute at hand. *See* 6 Patry on Copyright § 21:48 ("The issue of material contribution was not reached by the Supreme Court in vacating and remanding this decision since the Court found liability based on inducement."). Moreover, *Grokster* endorsed the broader common-law theories of contributory liability articulated in *Gershwin* and other authorities; it didn't constrict them. *See* 545 U.S. at 934-35 (explaining that "nothing in *Sony* requires courts to ignore evidence of intent if there is such evidence, and the case was never meant to foreclose rules of fault-based liability derived from the common law").

Grande further argues that if a party can be contributorily liable for copyright infringement simply by "materially contributing" to the conduct—without any purposeful, culpable conduct of its own—then *Grokster* and *Sony* are "meaningless." Grande contends that no copyright plaintiff would ever need to prove inducement of infringement as in *Grokster*—requiring "clear expression or other affirmative steps taken to foster infringement," 545 U.S. at 936-67—if they could simply show material contribution instead. Plaintiffs respond that the distinction between the material-contribution and inducement standards of liability is evident in *David v. CBS Interactive Inc.*, where a district court considered a claim against

a website that merely distributed P2P software and let the plaintiffs' inducement claim proceed to discovery while dismissing the plaintiffs' material-contribution claim. *See* No. 11-cv-9437, 2012 WL 12884914, at *3-5 (C.D. Cal. July 13, 2012). While we agree with Grande that material-contribution claims would appear to be more broadly attractive to plaintiffs than inducement claims, that's a policy argument that runs into *Alcatel*.

**c.**

As to *Twitter*, we note at the outset that it was litigated pursuant to the Justice Against Sponsors of Terrorism Act and does not mention copyright law. *See* 598 U.S. at 482-84. Thus, because material contribution remained a viable theory of secondary copyright infringement after *Grokster*, *Twitter* cannot furnish clear, contrary Supreme Court authority displacing *Alcatel* and its incorporation of *Gershwin*. To conclude otherwise would require us to decide that the Supreme Court changed fundamental principles of copyright liability without saying so in a case that was not about copyrights. *See Burge v. Parish of St. Tammany,* 187 F.3d 452, 466 (5th Cir. 1999) ("It is a firm rule of this circuit that in the absence of an intervening contrary or superseding decision by this court sitting en banc or by the United States Supreme Court, a panel cannot overrule a prior panel's decision.").

*Twitter* underscores the general importance, in all cases of secondary liability, of demonstrating a direct nexus between the defendant's conduct and the underlying tort at issue. While that nexus was absent in *Twitter*, it is present here as Grande's conduct directly enabled and facilitated continued copyright infringement by its subscribers.

In *Twitter*, family members of a victim of an ISIS terrorist attack in Istanbul, Turkey sued three U.S. social media companies, alleging that the companies aided and abetted ISIS by permitting its members to use the platforms for "recruiting, fundraising, and spreading their propaganda." 598

U.S. at 479, 481. The Court held that aiding-and-abetting liability (which also derives from common-law principles of secondary liability) requires courts to focus on the defendant's "assistance to the tort for which plaintiffs seek to impose liability." *Id.* at 506. In *Twitter*, the relevant underlying tort was the Istanbul terrorist attack. Because the defendants did not knowingly provide ISIS any assistance relating to the commission of that attack, they could not be liable on an aiding-and-abetting theory. *Id.* at 506-07.

The Court concluded that aiding-and-abetting claims are strongest when there is a "direct nexus" between the defendant's conduct and the underlying tort. *Id.* at 506. When such a "direct nexus" exists, courts and juries alike can "more easily infer" that the defendant's conduct—especially if done with knowledge of the tort—was "culpable." *Id.* By contrast, when no direct nexus exists, plaintiffs alleging aiding-and-abetting claims must instead show "participation through intentional aid" in order to generate the same inference of culpability. *Id.* The Court rejected the notion that "defendants' 'recommendation' algorithms go beyond passive aid and constitute active, substantial assistance." *Id.* at 499. Instead, the defendant's public social-media platforms are simply "infrastructure," and "[o]nce the platform and sorting-tool algorithms were up and running, defendants at most allegedly stood back and watched." *Id.* Because the plaintiffs in *Twitter* could not allege a direct nexus between the social media companies' services and the particular terrorist attack for which they sought relief, their claim could not survive absent evidence the companies intentionally supported ISIS, which they did not.

In contrast to *Twitter*, the nexus between Grande's conduct and the tort for which Plaintiffs seek redress is direct. The underlying tort at issue here is copyright infringement—specifically, the unauthorized distribution of Plaintiffs' copyrighted sound recordings by Grande's subscribers. Grande provided those subscribers with the tools necessary to conduct those

No. 23-50162

infringements (i.e., high-speed internet access) and continued doing so after
learning that those subscribers were repeatedly using those tools to infringe,
in furtherance of a policy never to terminate subscribers for copyright
infringement (i.e., not "mere passive nonfeasance").[10] *Id.* at 500. Unlike in
*Twitter*—where ISIS did not use the social media companies' services to
carry out its terrorist attack—this case involves tortfeasors that directly
relied on and used Grande's services to carry out their torts. Thus, the
liability verdict here is consistent with the Court's holding in *Twitter*; the
direct nexus between Grande's conduct and the tort at issue permits an
inference that Grande's knowing provision of internet services to infringing
subscribers was actionable.

**2.**

Next, we consider the district court's jury instruction on material
contribution. The district court instructed the jury that Grande is
contributorily liable if it "induced, caused, or materially contributed to the
infringing activity," and that "[t]his standard is met" if Grande could have
"take[n] basic measures to prevent further damages to copyrighted works,
yet intentionally continue[d] to provide access to infringing sound
recordings." Grande challenges that instruction on two principal grounds.

---

[10] These facts distinguish this case from *Twitter*'s reference to "the internet
generally" because, as the Court in *Twitter* explained, "we *generally* do not think that
internet or cell service providers incur culpability merely for providing their services to the
public writ large." 598 U.S. at 499 (emphasis added). Although aiding-and-abetting
liability also derives from common-law principles, it does not map one-to-one onto
contributory copyright infringement, meaning that *Twitter*'s broader language—
concluding that it would "run roughshod over the typical limits on tort liability" to
"effectively hold any sort of communication provider liable for any sort of wrongdoing
merely for knowing that the wrongdoers were using its services and failing to stop them,"
598 U.S. at 503—cannot in itself be read to uproot material-contribution liability.

No. 23-50162

**a.**

First, Grande takes issue with the court's instruction based on its adoption of the "simple measures" standard.[11] In several cases involving online infringements with new technologies, the Ninth Circuit has imposed an additional step before allowing a finding of contributory copyright liability. In these cases, even when the defendant provides the tools necessary for infringement, the court also inquires whether the defendant "can take simple measures to prevent further damage to copyrighted works." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007) (internal quotation marks and citation omitted). If such measures are available and the defendant does not take them, liability is appropriate. *See id.* at 1172-73; *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1021-22 (9th Cir. 2001). Conversely, if such measures are unavailable to the defendant, liability is inappropriate. *See VHT*, 918 F.3d at 745; *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 671-72 (9th Cir. 2017).

Grande contends that the line of "simple measures" cases is inapposite because it applies only to defendants "who directly control content online" because only such defendants "can readily remove or disable access to specific infringing content." However, the Ninth Circuit in *Amazon.com* clarified that it designed this test broadly for "the context of cyberspace" and for any defendant that provides "Internet access or services." 508 F.3d at 1171. That breadth was reflected in the test itself, which does not ask narrowly whether the defendant can remove access to the infringing content online, but more generally whether the defendant possesses "reasonable and feasible means" to "prevent further damage to

---

[11] Ninth Circuit cases uniformly use the term "simple measures." *See, e.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007). The district court used "basic measures" instead.

copyrighted works." *Id.* at 1172 (internal quotation marks and citation omitted). Thus, Grande urges an unduly limited reading of these authorities that is belied by the plain language of the cases themselves.

More importantly, as Plaintiffs correctly note, this standard favors *defendants* over copyright plaintiffs by offering defendants a way out if they have no "simple" (or "basic") means of avoiding secondary liability.[12] That's why in *Giganews*, the court ruled for the defendant—not because it failed to provide the tools necessary to infringe or lacked knowledge of infringing conduct—but because it found that plaintiff's proposed method by which the defendant could have prevented further damage to copyrighted works was "onerous and unreasonably complicated." 847 F.3d at 671. Similarly, the defendant in *VHT* prevailed not because it failed to provide tools for or lacked knowledge of direct infringement, but because while the plaintiff made three different proposals as to how the defendant could have prevented further damage to copyrighted works, the court found them all insufficiently practical. *See* 918 F.3d at 745-46.

The district court's "basic measures" instruction thus did not "lower[] the bar" of liability, as Grande contends; the instruction made clear that Grande was liable if it "intentionally continue[d] to provide access to infringing sound recordings," *unless* Grande was incapable of "taking basic measures to prevent further damages to copyrighted works." *See Amazon.com*, 508 F.3d at 1172. And here, Grande had available to it at least one basic measure: it could have terminated high-speed internet services to known, repeat infringers, as it did when subscribers failed to pay Grande's

---

[12] Indeed, Cox favorably "addressed the simple-measures test as an alternative to *Grokster*'s affirmative-conduct standard before the Fourth Circuit." Petition for Writ of Certiorari at 21, *Cox Commc'ns, Inc. v. Sony Music Ent.*, No. 24-171 (U.S. Aug. 15, 2024).

monthly fees.  In short, the "basic measures" instruction stood to benefit, not harm, Grande.  *See Mid-Continent*, 917 F.3d at 357.

### b.

Second, Grande disputes whether the district court's instruction—that "intentionally continu[ing] to provide access to infringing sound recordings" constitutes material contribution—was correct as a matter of law.  Grande contends that this instruction flouts *Grokster* and *Twitter* and was therefore erroneous because "[u]nder the district court's view, reflected in its jury instruction, a jury could permissibly find liability even in the absence of affirmative, culpable conduct."  Plaintiffs respond by citing what they call "the established principle that ISPs provide a material contribution to infringements by their subscribers when they knowingly provide infringing customers with the necessary tools to infringe—in particular, a high-speed connection to the internet."  We acknowledge this is a closer question, but we nonetheless conclude the instruction was not erroneous.

The closest on-point authorities considering the application of a material-contribution theory to ISPs are the Fourth Circuit's decisions in *BMG* (2018) and *Cox* (2024).  In *BMG*,[13] the court considered a contributory-infringement claim essentially on all fours with this one, arising out of Cox's continued provision of internet services to known infringing subscribers.  *See* 881 F.3d at 298-300.  The Fourth Circuit held that in a case involving "subscription services" like those provided by an ISP, liability could be imposed if the service provider learns that its customers are using its services to infringe and "nonetheless renews the lease to those infringing customers."  *Id.* at 308.  Under such circumstances, the continued provision of services

---

[13] *BMG* is the appeal that followed from the 2015 trial against Cox premised on its receipt of Rightscorp's notices, of which Grande was contemporaneously aware.

"is substantially certain to result in infringement, and so an intent to cause infringement may be presumed." *Id.*; *see also Grokster*, 545 U.S. at 932 (noting that a person "will be presumed to intend the natural consequences of his acts" (citation omitted)); RESTATEMENT (SECOND) OF TORTS § 8A cmt. b (1965) (acknowledging that if a person "knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result").

In *Cox*, as here, the Fourth Circuit affirmed a jury's finding that Cox was willfully liable for contributory copyright infringement because it intentionally continued to provide its internet services to infringing subscribers. In so doing, the Fourth Circuit squarely rejected the primary liability arguments made by Grande in this appeal. Specifically, the court applied the principle established in *BMG* that material contribution is an appropriate basis for a finding of contributory copyright liability. *See Cox*, 93 F.4th at 235-37. The court concluded that where, as here, an ISP knew of specific instances of repeated infringement by specific users and "chose to continue" providing services to them, a jury is entitled to find material contribution because the ISP's conduct exceeds "mere failure to prevent infringement." *Id.* at 236. That reasoning is incompatible with Grande's primary arguments that material contribution is insufficient to prove contributory infringement and that Grande did not materially contribute as a matter of law. Moreover, the court had the benefit of letter briefing on *Twitter* before it reached its decision. *See* Cox's 28(j) Letter, *Sony*, No. 21-1168 (4th Cir. May 23, 2023), ECF No. 87; Plaintiffs' Response to Cox's 28(j) Letter, *Sony*, No. 21-1168 (4th Cir. May 30, 2023), ECF No. 88. Although the court ultimately didn't cite *Twitter* in its decision, it held that imposing contributory liability on ISPs on the facts at issue there (which closely resemble those in this case) comports with the traditional principles

of aiding-and-abetting liability that *Twitter* addressed. *See Cox*, 93 F.4th at 236.

Grande maintains that those decisions—like the jury instruction here—stray from the principles set forth in *Grokster* and *Twitter*. Specifically, Grande points to language in *Grokster* providing that "in the absence of other evidence of intent, a court would be unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement, if the device otherwise was capable of substantial noninfringing uses." 545 U.S. at 939 n.12. *Grokster* held that "mere knowledge of infringing potential or of actual infringing uses" is not enough for liability. *Id.* at 937. And *Twitter* explained that a "communication provider" cannot be liable under an aiding-and-abetting theory "merely for knowing that [] wrongdoers were using its services and failing to stop them." 598 U.S. at 503.

These are not weak arguments. But the Fourth Circuit heard these same arguments about *Grokster* in *BMG* and about *Twitter* in *Sony*. Applying the "rules of fault-based liability derived from the common law" explicitly endorsed by *Grokster*, 545 U.S. at 934-35, the court in *BMG* found the requisite intent in the ISP's continued provision of services that were "substantially certain to result in infringement," 881 F.3d at 308. *Cox*, too, recognized *Grokster*'s rule that "mere[] . . . failure to take affirmative steps to prevent infringement" does not establish contributory liability "in the absence of other evidence of intent," 545 U.S. at 939 n.12, but nonetheless concluded that "supplying a product with knowledge that the recipient will use it to infringe copyrights is exactly the sort of culpable conduct sufficient for contributory infringement," *Cox*, 93 F.4th at 236. That's because such conduct "accords with principles of aiding and abetting liability in the criminal law." *Id.*; *see id.* ("Lending a friend a hammer is innocent conduct;

doing so with knowledge that the friend will use it to break into a credit union ATM supports a conviction for aiding and abetting bank larceny.").

Moreover, for the reasons explained above, *Twitter* does not control because it was litigated pursuant to the Justice Against Sponsors of Terrorism Act, not the Copyright Act. And *Grokster* must be read in light of the fact that it dealt with inducement liability, with no occasion to reach the issue of material contribution. *See* 6 Patry on Copyright § 21:48. Further, the component parts of the district court's jury instruction cannot be read in isolation: The instruction permitted a finding of liability only if the jury found Grande "intentionally continue[d] to provide access to infringing sound recordings" while *refusing* to "take basic measures to prevent further damages to copyrighted works." And Plaintiffs established at trial that, unlike Cox—which implemented a "graduated response system," *Sony Music Ent. v. Cox Commc'ns, Inc.*, 464 F. Supp. 3d 795, 816 (E.D. Va. 2020), *aff'd in part, vacated in part, rev'd in part*, 93 F.4th 222 (4th Cir. 2024)— Grande took *no* action in response to its subscribers' repeated infringements. So, Grande necessarily did not avail itself of any "basic measures" to prevent infringement.

Applying the same material-contribution standard, the court's instruction was proper in light of the factual disputes in this case. *See Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 944 (9th Cir. 2011) (holding the district court did not err "by narrowing the instruction on material contribution to the only genuine question as to that element"). At summary judgment, the district court determined that Grande's material contribution—its provision of the tools necessary for its subscribers to infringe—was "clear" and that the real "question" was whether Grande provided its services knowing that its customers were using them to infringe. There was therefore no factual dispute on that issue for the jury to resolve. The only issue left was whether Grande could have taken simple measures to

prevent further damages to copyrighted works, but failed to take them. That's precisely what the district court instructed the jury to determine. We see no error in the district court's decision to model its jury instruction after those upheld by the Fourth Circuit.

**3.**

The evidence at trial demonstrated that Grande provided its subscribers with the tools necessary to infringe (i.e., high-speed internet access) and that Grande's subscribers used those tools to infringe Plaintiffs' copyrights.[14] *See BMG*, 881 F.3d at 306–08. Based on the consistency of the trial evidence, the district court determined that there was "no question that [Grande] intentionally continued to provide Internet service" to its infringing subscribers.

Grande's affirmative choice to continue providing its services to known infringing subscribers—rather than taking simple measures to prevent infringement—distinguishes this case from *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142 (9th Cir. 2018), on which Grande relies. There, the Ninth Circuit considered a claim alleging that a subscriber of internet services who received infringement notices failed to "secure, police and

---

[14] We note that, at times, Plaintiffs' briefing appears to "direct[ly] leap from safe harbor to liability," implying that "an ISP has two options: qualify for the safe harbor or be found liable for copyright infringement." As the district court's jury instructions properly recognized, § 512(*l*) forecloses that argument by providing that an ISP's failure to qualify for the safe harbor "shall not bear adversely upon the consideration of a defense by the [ISP] that [its] conduct is not infringing under this title or any other defense." 17 U.S.C. § 512(*l*). However, Grande does not contend on appeal that the district court erred in admitting any evidence pertaining to the safe harbor. And the district court did not prevent Grande from contesting its liability on grounds other than the safe harbor: namely, by attempting to refute Plaintiffs' evidence supporting any of the four elements that Plaintiffs were required to prove (e.g., by demonstrating that Rightscorp's notices did not trigger any duty by Grande because they were unreliable). That's precisely what Grande attempted to do at trial—the jury just didn't find Grande's defense persuasive.

No. 23-50162

protect" his account from third parties who used his internet access to infringe. *Cobbler*, 901 F.3d at 1145-46. The direct infringers were never identified. *See id.* at 1145 n.1. Because the pleading premised liability exclusively on the subscriber's failure to take action against unknown third-party infringers, it was insufficient to state a claim. *See id.* at 1147-49. Here, Plaintiffs proved at trial that Grande knew (or was willfully blind to) the identities of its infringing subscribers based on Rightscorp's notices, which informed Grande of specific IP addresses of subscribers engaging in infringing conduct. But Grande made the choice to continue providing services to them anyway, rather than taking simple measures to prevent infringement. Additionally, *Cobbler* addressed only inducement liability under *Grokster*; it did not opine on the evidence required for establishing material contribution. *See id.* The court in *Cobbler* rejected the plaintiff's invitation to create "an affirmative duty for private internet subscribers to actively monitor their internet service for infringement," *id.* at 1149; it did not absolve ISPs like Grande that continue providing services to known infringing subscribers.

The evidence at trial demonstrated that Grande had a simple measure available to it to prevent further damages to copyrighted works (i.e., terminating repeat infringing subscribers), but that Grande never took it. On appeal, Grande and its amici make a policy argument—that terminating internet services is not a simple measure, but instead a "draconian overreaction" that is a "drastic and overbroad remedy"—but a reasonable jury could, and did, find that Grande had basic measures, including termination, available to it. *See Amazon.com*, 508 F.3d at 1172. And because Grande does not dispute any of the evidence on which Plaintiffs relied to prove material contribution, there is no basis to conclude a reasonable jury lacked sufficient evidence to reach that conclusion.

\*      \*      \*

No. 23-50162

In sum, because (1) intentionally providing material contribution to infringement is a valid basis for contributory liability; (2) an ISP's continued provision of internet services to known infringing subscribers, without taking simple measures to prevent infringement, constitutes material contribution; and (3) the evidence at trial was sufficient to show that Grande engaged in precisely that conduct, there is no basis to reverse the jury's verdict that Grande is liable for contributory infringement.[15]

## IV.

Next, we consider Grande's damages argument, which presents a question of first impression in this circuit.[16] The district court determined that each of Plaintiffs' 1,403 sound recordings that was infringed entitled Plaintiffs to an individual statutory damages award. Grande contends that the text of the Copyright Act requires a different result: Whenever more than one of those recordings appeared on the same album, Plaintiffs are entitled to only one statutory damages award for that album, regardless of how many individual recordings from the album were infringed. Grande has the better reading of the text of the statute.

Under § 504 of the Copyright Act, a copyright owner may elect to recover

---

[15] Because we affirm the jury's liability verdict, we do not reach Plaintiffs' cross-appeal challenging the district court's jury instruction concerning proof of actual distribution.

[16] The only Fifth Circuit case to have addressed this question did so in an unpublished opinion, in which the court similarly concluded "that the district court did not abuse its discretion in treating the photographs"—which the plaintiff had registered "under a single copyright registration number" and which he "himself refer[red] to . . . in the record on appeal as a 'collection'"—"as a compilation instead of individual works for purposes of calculating damages." *Cullum v. Diamond A Hunting, Inc.*, 484 F. App'x 1000, 1002 (5th Cir. 2012) (per curiam).

> an award of statutory damages for all infringements involved in
> the action, with respect to *any one work*, . . . in a sum of not less
> than $750 or more than $30,000 as the court considers just.
> For the purposes of this subsection, *all the parts of a compilation*
> *or derivative work constitute one work.*

17 U.S.C. § 504(c)(1) (emphases added). The Copyright Act defines a
"compilation" as "a work formed by the collection and assembling of
preexisting materials or of data that are selected, coordinated, or arranged in
such a way that the resulting work as a whole constitutes an original work of
authorship." *Id.* § 101. The term "compilation" includes "collective
works," which are defined as works "in which a number of contributions,
constituting separate and independent works in themselves, are assembled
into a collective whole." *Id.* To be eligible for statutory damages for
infringement of "any one work" under § 504, the copyright owner must have
registered "the work" within the time required by § 412, which is titled
"Registration as prerequisite to certain remedies for infringement." *See* 17
U.S.C. §§ 412, 504(c); *see also S. Credentialing Support Servs., L.L.C. v.
Hammond Surgical Hosp., L.L.C.*, 946 F.3d 780, 785 (5th Cir. 2020)
(emphasizing "the need for the limit on statutory damages to be read
consistently with the provision [§ 412] authorizing those damages in the first
place").

The Supreme Court has "ma[d]e clear that the starting point for our
analysis is the statutory text." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98
(2003). "And where, as here, the words of the statute are unambiguous, the
'judicial inquiry is complete.'" *Id.* (quoting *Conn. Nat'l Bank v. Germain*,
503 U.S. 249, 254 (1992)). The plain language of the Copyright Act
mandates the conclusion that each registered compilation is eligible for only
one award of statutory damages. As the Supreme Court has "stated time and
again," "courts must presume that a legislature says in a statute what it

means and means in a statute what it says there." *Conn. Nat'l Bank*, 503 U.S. at 253-54.

In concluding otherwise, the district court "found that the majority of case law holds that when individual sound recordings are available as individual works, a plaintiff can recover one statutory damages award per recording." The district court's assessment of existing circuit case law was accurate: As Plaintiffs contend, the majority of the seven circuits to have considered this question apply a "functional" test that looks to "where the market assigns value," deciding whether the parts of a compilation are individually eligible for statutory damages by determining whether the parts have "independent economic value." *Sullivan v. Flora, Inc.*, 936 F.3d 562, 572 (7th Cir. 2019). In addition to the Seventh Circuit, the D.C., First, Ninth, and Eleventh[17] Circuits also take this approach. *See, e.g.*, *Walt Disney Co. v. Powell*, 897 F.2d 565, 570 (D.C. Cir. 1990); *Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1117-18 (1st Cir. 1993); *VHT*, 69 F.4th at 990; *MCA Television Ltd. v. Feltner*, 89 F.3d 766, 769 (11th Cir. 1996).

Contrary to Plaintiffs' assertion, the Second Circuit has not adopted this functional test, although it has awarded statutory damages for individual songs on albums. In *EMI Christian Music Group, Inc. v. MP3tunes, LLC*, the Second Circuit acknowledged that "[m]aterials that are sold as part of a compilation, such as songs on an album, ordinarily are not deemed separate works for the purpose of determining statutory damages." 844 F.3d 79, 101

---

[17] Notably, since its decision in *Feltner* adopting the independent-economic-value test, the Eleventh Circuit appears to have narrowed its application of that test. *See Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1279 (11th Cir. 2015) ("Although this Court held that the particular television episodes in *Feltner* were separate works because they could each 'live their own copyright life,' we certainly do not read the *Feltner* decision as foreclosing the application of 17 U.S.C. § 504(c)(1)'s directive that 'all parts of a compilation . . . constitute one work' for all cases." (internal citation omitted)).

(2d Cir. 2016) (citing *Bryant*, 603 F.3d at 141). Notwithstanding its decision in *Bryant*, in which the Second Circuit held that "[a]n album falls within the [Copyright] Act's expansive definition of [a] compilation," *Bryant*, 603 F.3d at 140, the court in *MP3tunes* concluded that "when a copyright holder or publisher issues material on an independent basis, the law permits a statutory damages award for each individual work," *MP3tunes*, 844 F.3d at 101. That was so, the court in *MP3tunes* reasoned, even though *Bryant* had held that "[b]ased on a plain reading of the statute, . . . infringement of an album should result in only one statutory damage award," and "[t]he fact that each song may have received a separate copyright"—and that the infringer "sold the songs individually"—"is irrelevant to this analysis." *Bryant*, 603 F.3d at 140-41. The court in *MP3tunes* reached that conclusion because the "focus is on whether the plaintiff—the copyright holder—issued its works separately, or together as a unit," not on how the infringer distributed the works. 844 F.3d at 101. So, the district court "properly allowed separate statutory damages awards for songs that the plaintiffs issued as singles, even if those songs were also made available on albums." *Id.*

The Fourth Circuit's approach also has uncertainty. Its answer to the question presented in *Xoom, Inc. v. Imageline, Inc.* followed the Second Circuit's approach in *Bryant* but suggested that different facts might require a different construction of § 504(c)(1). 323 F.3d 279, 285 (4th Cir. 2003), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010). In *Xoom*, the court determined that two collections of several thousand digital images, protected under two copyright registrations, were compilations and thus only eligible for two statutory damages awards under § 504(c)(1). *See id.* at 285 n.8 (explaining that "Imageline is entitled to one award of statutory damages per work infringed because SuperBundle and Master Gallery are *compilations or derivative works* in which Imageline holds copyrights"). At another point in its opinion, however, the Fourth Circuit

appeared to agree that "the Copyright Act does not bar multiple awards for statutory damages when one registration includes multiple works." *Id.* at 285. As the Seventh Circuit in *Sullivan* recognized, "[t]his qualification is substantial and seems to suggest the Fourth Circuit may chart a different course—perhaps the one followed by most other circuits—on different facts." 936 F.3d at 571; *cf. Cox*, 93 F.4th at 240 (assuming arguendo Cox's contention "that Plaintiffs were not entitled to separate statutory damages awards for songs that were contained on the same album," but "not decid[ing] whether Cox's legal premise [was] sound" because "Cox [did] not identify evidence from which the jury could have determined which songs were released on albums together").

Plaintiffs urge this court to adopt the majority approach and affirm the district court's ruling that because each song "has its own independent economic value in the marketplace at the time it is infringed, it constitutes a separate work for the purpose of determining eligibility for statutory damages." But their position—which, admittedly, is a position shared by five other circuit courts—cannot be squared with the statutory text.

Nothing in the statute permits Plaintiffs to recover damages for each individual song because the song was "exploited . . . individually," or began to live its "own copyright life." *Gamma Audio & Video*, 11 F.3d at 1116 (citation omitted). Instead, because—as Plaintiffs concede—each album constitutes a compilation, the statutory text constrains Plaintiffs' eligible award to statutory damages for each *album*, rather than each *song* in suit.

Record evidence supports this conclusion. The works' certificates of registration—which are "prima facie evidence . . . of the facts stated" therein, 17 U.S.C. § 410(c)—bear numerous hallmarks of compilations. Many of the certificates feature express notations like "Basis for registration: collective work," "Compilation of sound recordings," and "Sound

recordings registered as a collective work." Those same certificates and many others identify the album title as the "Title of Work." Additionally, many of the certificates identify preexisting material to be excluded from the registration, as required "in the case of a compilation or derivative work." 17 U.S.C. § 409(9). And nearly all the registrations are designated as "works made for hire." "Work made for hire" status is available only for certain types of works. 17 U.S.C. § 101. Here, because the artists were not Plaintiffs' employees, the only two possible bases for "work made for hire" registration are that the work is a "compilation" or a "collective work," which is a species of compilation. *See id.*

The amicus supporting plaintiffs, the Copyright Alliance, separately contends that "[w]hile Section 504(c)(1) of the Act provides that all parts of a compilation constitute one work, it does *not* say that individual works in a compilation cannot also exist as separate, independent works." *See VHT*, 69 F.4th at 990. But with all due respect, that is not what the statute says. True, parts of a compilation can constitute separate works for other purposes,[18] but "[f]or the purposes of [§ 504(c)], all the parts of a compilation or derivative work constitute one work." 17 U.S.C. § 504(c)(1). "One work" means *one* work: If parts of a compilation are counted independently of the compilation and as additive *to* the compilation, they—mathematically and axiomatically—no longer constitute "one work." So, in fact, § 504 *does* "say that individual works in a compilation cannot also exist as separate,

---

[18] Relevant legislative history confirms that

[w]here the suit involves infringement of more than one separate and independent work, minimum statutory damages *for each work* must be awarded. . . . Subsection (c)(1) makes clear, however, that, *although they are regarded as independent works for other purposes*, "all the parts of a compilation or derivative work constitute one work" for this purpose.

H.R. Rep. No. 94-1476, at 162 (1976) (emphases added).

independent works"—at least when determining eligibility for "an award of statutory damages for all infringements involved in the action." *Id.*

The Copyright Alliance also marshals policy arguments against this interpretation of the statutory text. The Copyright Alliance complains that the result of Grande's reading is harsh and will "threaten the livelihood of some copyright owners." Paraphrasing the Ninth Circuit, the Copyright Alliance argues that if a copyright holder could receive only one statutory damage award for infringements of multiple works that have independent value, then the attempt to save the copyright owner expenses and foster efficiency via registration of a compilation, collective work, or group registration[19] would be "at best an empty gesture and at worst a cruel joke." *VHT*, 69 F.4th at 992. But "to award statutory damages on a per-song basis would make a total mockery of Congress'[s] express mandate that all parts of a compilation must be treated as a single 'work' for purposes of computing statutory damages." *Bryant*, 603 F.3d at 142 (internal quotation marks and citation omitted). And between policy arguments and the statutory text—no matter how sympathetic the plight of the copyright owners—the text must prevail. *See Desert Palace*, 539 U.S. at 98. So, the strong policy arguments made by Plaintiffs and their amicus are best directed at Congress.

In sum, the record evidence indicates that many of the works in suit are compilations (albums) comprising individual works (songs). The statute unambiguously instructs that a compilation is eligible for only one statutory damage award, whether or not its constituent works are separately

---

[19] Importantly, "[n]one of the works at issue here were registered using group registration," which—along with individual registration of each work—Grande acknowledges would "provide[] the public notice Congress intended." *See* 37 C.F.R. § 202.4.

copyrightable. Thus, the district court erred in holding that each individual song in a compilation was eligible for a statutory damage award.

\* \* \*

All that remains is the appropriate remedy. For the first time on appeal, Grande asks this court to "reverse the district court's denial of JMOL and modify the statutory damages award to $22,066,446 based on 662 copyrighted works." In its renewed motion for JMOL or a new trial, Grande requested only that the district court "order a new trial on the issue of statutory damages." Nowhere in its briefing at summary judgment or post-judgment did Grande assert that only 662 copyrighted works in evidence were eligible for statutory damages. In Grande's own words below, "[n]o factfinder has considered these issues and determined from the record evidence which of the 1,403 sound recordings at issue are entitled to and eligible for a separate award of statutory damages under sections 504(c) and 412." Accordingly, we vacate the statutory-damages award and remand for a new trial on damages with the proper jury instruction. *See Sullivan*, 936 F.3d at 572 (vacating where "[t]he district court did not ask (or put to the jury) the questions . . . necessary for resolving the statutory damages question").

## V.

For the foregoing reasons, we AFFIRM the jury's verdict finding Grande liable for contributory copyright infringement; VACATE the jury's damages award and REMAND for a new trial on damages; and DISMISS Plaintiffs' conditional cross-appeal as moot.